## UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL DOULTON USA INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SCHENKER, INC., )<br>)<br>Defendant. )<br>_____ ) | Case No. _____ |

### COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF AND DAMAGES

Plaintiff Royal Doulton USA Inc., by counsel, for its Complaint for Declaratory Relief and Damages against Defendant Schenker, Inc., states as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Royal Doulton USA Inc. ("Royal Doulton") is a for-profit foreign corporation, incorporated in Delaware, with its principal place of business located at 200 Cottontail Lane, Somerset, New Jersey, 08873, and is in the business of selling certain consumer products, such as high quality china sets.

2.     Defendant, Schenker, Inc. ("Schenker"), is a for-profit foreign corporation, incorporated in New York, with its principal place of business located at 150 Albany Avenue, Freeport, New York, 11520.

3.     This Court has jurisdiction and venue is proper because Royal Doulton and Schenker contractually consented to the jurisdiction of Delaware courts, agreeing that any dispute arising out of their contractual relationship shall be resolved according to Delaware law, and selecting this venue for any such proceedings. (*See* Warehousing and Distribution Service

Agreement, executed August 26, 2002 (the "Agreement"), a true and correct copy of which is

attached hereto as Exhibit A, at ¶ 40.)  Specifically, the parties agreed that:

> Th[e] Agreement shall be governed by and construed in accordance
> with the laws of the state of Delaware without regard to its conflicts
> of laws provisions.  The parties hereby consent to the jurisdiction of
> the state and the federal courts situated in the state of Delaware to
> the exclusion of all other jurisdiction in any proceeding arising from
> or related to this Agreement.  The parties waive the right to a trial
> by jury in any such proceeding.

(Exh. A, at ¶ 40.)  Royal Doulton's dispute with Schenker arises from the Agreement.

　　　　4.　　　This Court has jurisdiction pursuant to 28 U.S.C. §1332 because the amount in

controversy, exclusive of interest and costs, exceeds $75,000, and there is complete diversity of

citizenship between the parties.

## GENERAL ALLEGATIONS

　　　　5.　　　In August 2002, Royal Doulton and Schenker entered into the Warehousing and

Distribution Service Agreement, commencing on August 26, 2002 (the "Agreement").  A true

and accurate copy of the Agreement is attached hereto as Exhibit A.

　　　　6.　　　Pursuant to the Agreement, Schenker, who "stores and handles goods as a bailee

for hire," "agreed to act as provider of a Distribution Center ('DC') and the Services for the term

and otherwise subject to the terms and conditions set out in th[e] Agreement."  (Agreement,

Recitals, at ¶ B.)  The term of the Agreement is three years, with a resulting termination date of

August 26, 2005.  (See Exh. A, at ¶ 2.1.)

　　　　7.　　　"Services" are defined by the Agreement as

> the provision of a DC and warehousing and distribution services, which
> include, but may not be limited to
>
> (a) receipt of Products into store;
>
> (b) storage of Products;

(c) order picking;

(d) packing of orders;

(e) invoicing customers;

(f) dispatch of Products;

(g) cartage to store/transportation to customers;

(h) transportation and processing of returns; [and]

(i) preparation and supply of standard operational documentation.

(Exh. A, Definitions, at ¶ 1.1.)

8.      "Products" are defined as "the ceramic or other products sold by [Royal Doulton] from time to time, and include any new, promotion or replacement products, which are within the same general ranges of products as the original products." (Exh. A, Definitions, at ¶ 1.1.)

9.      As its distribution service provider, Royal Doulton relied on Schenker's performance under the Agreement to maintain Royal Doulton's high standards and its reputation with those who buy and re-sell Royal Doulton's products.

10.     Pursuant to the Agreement, Schenker is required "[t]hroughout the duration of th[e] Agreement ... [to] undertake[] and agree[] to remain the registered proprietor or lessee of the Premises" (Exh. A, at ¶ 6.3), maintaining such Premises "in a clean and orderly condition" (Exh. A, at ¶ 6.4(a)).

11.     "Premises" are defined in the Agreement as "the DC at Building 48, Park 100 Business Park, 5010 W. 81st Street, Indianapolis, IN  46268 or such other location as agreed in writing between Schenker and Royal Doulton." (Exh. A, Definitions, at ¶ 1.1.)  The DC address and "Premises" for the duration of the Agreement was and continues to be 5240 West 76th Street, Indianapolis, IN 46268.

12.    Under the terms of the Agreement, Schenker obligated itself to "use its best endeavors not to jeopardize or damage the business of Royal Doulton." (Exh. A, at ¶ 11(c).)

13.    The Agreement also contains a section devoted to the parties' good faith obligations. (*See* Exh. A, at Section 10, ¶¶ 10.1-10.3.)

14.    Paragraph 10.1 provides: "**Each party shall at all times deal with the other party in good faith, and shall do such things as shall be incidental to, and reasonably for, the provision of Services.**" (Exh. A, at ¶ 10.1) (*emphasis supplied*).

15.    Paragraph 10.2 provides: "**Each party shall not, during the term of this agreement, knowingly or recklessly do anything, which might damage or bring into disrepute the other party's reputation, products or customers.**" (Exh. A, at ¶ 10.2)(*emphasis supplied*).

16.    The Agreement specifically sets forth the terms of payment and contract rates. (*See* Exh. A, at ¶¶ 22.1 - 22.5.)  Pursuant to the Agreement, Royal Doulton is required to pay Schenker only "for the Services as is determined in accordance with the Contract Rates." (Exh. A, at ¶ 22.1.)

17.    The Contract Rates are "the rates for Services set out in Schedule 1." (Exh. A, Definitions, at ¶ 1.1.)  Schedule 1 sets forth both recurring fees as well as the investments to be amortized over the three-year period of the Agreement. (*See* Exh. A, at Sch. 1.)

18.    While Schenker was required to comply with certain notification provisions in the event that it determined not to extend the life of the Agreement,  Royal Doulton was not constrained by any such notice of non-extension provisions. (*See* Exh. A, at ¶ 2.2)

19.    Prior to 2002, Royal Doulton's warehouse distribution center operations were handled in-house.

20.    In 2002, Royal Doulton sent requests for proposal to several third-party logistics firms.

21.    Before receiving bids, Royal Doulton allowed Schenker the opportunity to view Royal Doulton's distribution operations, discuss in detail Royal Doulton's distribution needs, and generally learn Royal Doulton's business.   Schenker's personnel visited Royal Doulton's Somerset, New Jersey distribution center, observed its operations and learned the nature and extent of Royal Doulton's distribution business.  With knowledge of Royal Doulton's distribution needs and operations, Schenker submitted a bid.

22.    Royal Doulton accepted Schenker's bid and entered into the Agreement with Schenker, effective August 26, 2002.

23.    Schenker lacked experience in addressing issues of retail noncompliance and charge backs.

24.    During the course of the Agreement, Schenker bought CCW Logistics ("CCW"), a consumer goods logistics company.  Schenker installed former CCW personnel in the Royal Doulton distribution center.

25.    In or around the fall of 2003, Schenker began complaining to Royal Doulton that it was losing money on Royal Doulton's account, asserting that such loss was based on certain "account characteristics changes."

26.    The parties entered into discussions about Schenker's complaints in or about October 2003.  A true and accurate copy of the final but unsigned version of a letter dated October 5, 2003 from Richard Falk ("Falk"), President and COO of Schenker-CCW, to Patrick Murray ("Murray"), Director of Logistics, Royal Doulton, is attached hereto as <u>Exhibit B</u>.  A true

and accurate copy of the final but unsigned version of Murray's October 13, 2003 letter to Falk in response is attached hereto as Exhibit C.

27.     In particular, Falk and Murray discussed Schenker's assertion that Royal Doulton's account characteristics had changed.  Murray asked Falk what account characteristics had changed, and Falk listed what he asserted to be such changes, including big sets and set building.[1]  Murray explained that the items listed by Falk were not account characteristic changes, reminding Falk that Schenker's personnel had seen big sets and set building at Royal Doulton's in-house warehouse facility when conducting its diligence in Somerset.  Murray explained that Schenker had an opportunity to see Royal Doulton's account characteristics in Somerset prior to offering Royal Doulton a quote for its logistics services.

28.     Schenker had no other explanation for its complaints.  It became clear that Schenker had underbid the Agreement and was simply trying to extract more money to redeem what had turned out to be, from Schenker's perspective, a "bad bargain."

29.     On February 17, 2004, the parties met in Toronto, Canada.  True and accurate copies of notes documenting that meeting are attached as Exhibit D.

30.     At the February 17, 2004 meeting, Heiner Murmann ("Murmann"), President and CEO of Schenker, discussed Schenker's financial position, maintaining that Schenker had lost $200,000.00 on the Royal Doulton account.  (See Exh. D;  see also a true and accurate copy of the final but unsigned version of a Murray's February 18, 2004 letter to Murmann regarding the meeting, which is attached hereto as Exhibit E.)

---

[1]   The sets of china stored and distributed by Royal Doulton may have as many as two to twenty-eight pieces, and Royal Doulton maintains a large stock of pieces for the sets it sells and distributes.  The sets are sometimes built by adding pieces to boxed sets; for example, four pieces might be added to a twenty-piece box set of china, making a larger set of twenty-four pieces.

31.    As the only account characteristic that had changed was volume, which had gone *down*, and which change should have triggered a decrease in payments rather than an increase, Murray again inquired as to what account characteristics Schenker alleged had changed or went wrong vis-à-vis the Agreement, stating that Royal Doulton would look into any account characteristics changes as defined in the Agreement and would then discuss the purported $200,000.00 loss. (*See* Exhs. D, E.)  Schenker did not answer.

32.    On February 22, 2004, Falk sent Royal Doulton a follow-up e-mail, wherein he requested monthly payments of $16,666 per month, *i.e.*, a payment of approximately $200,000.00 annually.  True and accurate copies of that e-mail and related communications are attached hereto as Exhibit F.  Consistent with its past conduct, Schenker offered no contractually based explanation regarding its unilateral and substantial price increase.

33.    From March 2004 on, Schenker's monthly invoices to Royal Doulton included a line item for "Value-added services" in the amount of $16,666.  Because Schenker has failed to explain why, under the Agreement, Royal Doulton is obligated to make such payments, Royal Doulton has made it a practice to deduct those $16,666 charges from Schenker's invoices, paying the balance of each invoice in full.

34.    Between March 2004 and the second quarter of 2005, Schenker never demanded that Royal Doulton make the $16,666 payments nor sent the matter to collection.  While the issue did come up at various points during 2004, *e.g.*, when Royal Doulton would request that the "Value-added services" be removed from the invoices and Schenker would refuse, Royal Doulton's inquiries as to Schenker's intentions to collect on those amounts were never answered. Schenker failed and refused to provide any explanation for its unilaterally imposed efforts to change the bargained-for price terms.

35.     In or about early 2005, Royal Doulton determined that it was in the corporation's best interest to transfer its operations at the end of the Agreement from the DC leased by Schenker to a company-owned facility in Wall Township, New Jersey. The Agreement contains no provision that would have required Royal Doulton to give notice of its intention to Schenker not to renew prior to the end of the Agreement.

36.     Although not required to do so, Royal Doulton informed Schenker that it would not be renewing the Agreement.

37.     Also at or around this time, the issue of the $16,666 charges began coming up again. However, Murmann verbally expressed that Royal Doulton, at least for the time being, need not worry about those charges. In addition, Schenker's Chief Financial Officer, upon information and belief, F. Schaeffer, expressed in writing that the $16,666 charges would be addressed at some other time. Moreover, Schenker's credit manager, to whom Royal Doulton was sending payments via wire transfer, also said not to worry about the charges when directly asked what to do about them. Royal Doulton's President, Art Bylin ("Bylin"), spoke with Murmann regarding the $16,666 charges and was told not to worry for now.

38.     On May 19, 2005 and May 26, 2005, Graeme Watson ("Watson"), Vice President of Logistics Operations, Schenker, e-mailed Tom Hickey ("Hickey"), Vice President of Operations, Royal Doulton, to propose a retention bonus of $18,000.00 to employees working at the Indianapolis location as an incentive to stay at that location until it closed at the time of termination of the Agreement. True and accurate copies of those e-mails are attached hereto as Exhibit G.

39.     Royal Doulton's understanding based on those e-mails was that a payment by Royal Doulton to Schenker in the amount of $18,000.00 in the form of a retention bonus "would

guarantee everyone staying until the facility closes if [the employees] accept[]."  A true and accurate copy of Hickey's May 26, 2005 e-mail to Donald Stubbs ("Stubbs"), Vice President, Finance, Royal Doulton, and Bylin summarizing the proposed agreement is attached hereto as Exhibit H.

40.    On May 31, 2005, Royal Doulton agreed to Schenker's request for the $18,000.00 retention bonus, expressing its support in offering the bonus to the Indianapolis location employees.  A true and accurate copy of Hickey's May 31, 2005 e-mail to Watson accepting the terms of Schenker's offer is attached hereto as Exhibit I.

41.    Upon information and belief, on or about June 1, 2005 and June 9, 2005, Eric Dewey ("Dewey"), Vice President of Logistics, Schenker, sent e-mails to Stubbs: (1) demanding that Royal Doulton make a $375,502.50 payment of amounts outstanding, approximately $225,000.00 of that amount consisting of the $16,666 charge accruals, by June 15, 2005; (2) maintaining that Royal Doulton will be pre-billed, making payments prior to month's end, paying within 15 days of billing; and (3) asserting that Royal Doulton must pay "closing costs" by July 15, 2005 in an amount to be determined by Schenker upon conclusion of Schenker's research into the issue.  A true and accurate copy of Dewey's June 1, 2005 e-mail to Stubbs is attached hereto as Exhibit J.  A true and accurate copy of the final version of Stubbs' June 10, 2005 response to those June 1, 2005 and June 9, 2005 e-mails, although unsigned, is attached hereto as Exhibit K.

42.    On June 10, 2005, Stubbs responded to Dewey via letter, requesting further details on the requested payment, and reminding Schenker that the Agreement does not provide for the amounts requested by Schenker.  (*See* Exh. K.)  Still, Royal Doulton acceded, as a

showing of good faith, to payment on the requested pre-bill basis, even though it was not obligated to do so. (*See* Exh. K.)

43.    On June 27, 2005, Royal Doulton received an invoice numbered 38604676 from Schenker dated June 23, 2005, which quoted the amount due as $248,081.16, payable July 15, 2005. A true and accurate copy of that invoice is attached hereto as Exhibit L.

44.    On July 7, 2005 Royal Doulton responded to the June 23, 2005 invoice, questioning and objecting to the charges stated therein. A true and accurate copy of Royal Doulton's letter to Schenker is attached hereto as Exhibit M.

45.    As Stubbs explained in his letter, the "asset remaining book value" charge of $203,090.16 has no contractual basis as it is not included in the Contract Rates. (*See* Exh. M.)

46.    The remaining $44,991.00 balance was described as "closing costs," which are not included in the Contract Rates set forth in the Agreement. (*See* Exh. M.)

47.    The amounts set forth in the June 23, 2005 invoice are related to the termination of the Agreement and to Schenker's related vacation of the Premises. (*See, e.g.*, the true and accurate copy of Thurman Walker's June 22, 2005 e-mail to John Richardson, "FW: Rack Relocation Quote," which is attached hereto as Exhibit N.) Again, these are not contractual charges.

48.    Given the $248,081.16 set forth in the June 23, 2005 invoice and the monthly $16,666 "added-value costs," Schenker maintains that Royal Doulton owes it in excess of $500,000.00 without citing any contractual basis for that request.

49.    On July 11, 2005, at approximately 10:30 a.m. E.S.T., Hickey received a telephone call from John Richardson ("Richardson"), the warehouse manager for the Premises.

Richardson informed Hickey that Dewey had e-mailed him, telling him to prepare to shutdown operations if Schenker had not received the requested July 15, 2005 payment on or by that date.

50.    Hickey left voice messages for Dewey in response to Richardson's call, and, when he had not heard from Dewey by the following day, he also left voice mail messages for Watson.

51.    On July 12, 2005, Hickey received an e-mail, a true and accurate copy of which is attached hereto as <u>Exhibit O</u>, from Dewey, which was sent in response to Hickey's voice mails. The letter misstated Royal Doulton's position as agreeing to pay the disputed amounts charged by Schenker. (*See* Exh. O.)

52.    Also on July 12, 2005, Bylin telephoned Murmann in an attempt to resolve the dispute. Murmann was pleasant at first, and stated that he recognized that the amount owed Schenker by Royal Doulton had always been disputed, clarifying the inaccuracy of Dewey's July 12, 2005 e-mail. However, instead of offering contractually-based explanations for the disputed amounts, Murmann stated in a loud and aggressive voice: "just pay the bill!," at which point the conversation ended.

53.    On July 13, 2005, Dewey e-mailed Stubbs in response to his July 7, 2005 letter, stating that the "invoice simply covers Schenker's actual costs to meet Royal Doulton's requirements for transition." A true and accurate copy of that e-mail correspondence is attached hereto as <u>Exhibit P</u>. Dewey requested therein that Schenker be "paid, in advance, for these costs, [or else] it is not possible for Schenker to proceed with the transition." (Exh. P.)

54.    Royal Doulton participated in a telephone conference with Schenker on July 14, 2005. Schenker maintained at the July 14, 2005 telephone meeting that the amount owed was $585,401.09 and refused to back down on its intention to cease operations as of July 15, 2005 unless Royal Doulton paid a portion of the amount it sought, *i.e.*, $328,313.00.

11

55.     Royal Doulton was left with no choice but to agree to pay, under duress, the disputed portion in installments under protest and with reservation of rights in a desperate effort to keep operations running.

56.     Had Schenker shut-down its operations at the Indianapolis facility, Royal Doulton would not have been able to ship Products by the dates on which certain of its purchase order agreements became non-binding as to certain customers, allowing those customers to cancel their orders without violating their purchase order agreements, resulting in penalty charges, order cancellations, and a material risk of loss of customers, including large department stores. Such a shut-down would have caused a double-delay of delivery, as Royal Doulton had already informed its customers of the approaching delay in August 2005 when Royal Doulton will move Products from the Indianapolis DC to its company-owed Wall Township, New Jersey facility. Schenker's threatened breach would have resulted in a loss of goodwill, harm to Royal Doulton's reputation and customer relationships, and harm to the goodwill and reputations of Royal Doulton's retail customers.

57.     The Agreement provides for alternative dispute resolution procedures.  (*See* Exh. A, at ¶¶ 37.1 - 37.6.)  However, during the course of the July 15, 2005 telephone meeting, Schenker failed and refused to agree to any alternative dispute resolution procedure, thus forcing Royal Doulton to file this lawsuit.

58.     In light of the immediate harm that would have befallen Royal Doulton if Schenker had made good on its intention to perform an immediate and unilateral shut-down, Royal Doulton determined that payment of part of the disputed charge under protest was in the best interests of the company - both economically and with regard to its good will and reputation - and of its current and potential customers, and their customers.

59.    The parties entered into an agreement according to which Schenker would not shut down the Indianapolis facility in exchange for a payment by Royal Doulton in the amount of $328,313.00.  A true and accurate copy of Stubbs' July 21, 2005 letter to Murmann, which documents Royal Doulton's agreement to pay under protest the requested charge of $328,313.00 to prevent a shut-down, is attached hereto as Exhibit Q.

60.    Although the parties had discussed the $328,313.00 amount as including current invoices during the July 14, 2005 telephone meeting, in an e-mail of July 15, 2005, Dewey changed the values of Schenker's demand to remove the issue of current invoices, insisting upon the disputed charges and making separate reference to the current invoices.  A true and accurate copy of Dewey's July 15, 2005 e-mail is attached hereto as Exhibit R.  As set forth in the e-mail, Dewey breaks down the $328,313.00 as $283,322.00 in "Additional service invoices from March 2004" and $44,991.00 in "Closing costs."  (See Exh. R.)

61.    On July 15, 2005, Stubbs responded to Dewey by letter, wherein he explained that Royal Doulton's payment to Schenker would be made under protest and duress and that it continued to dispute the amounts that Schenker have charged Royal Doulton.  A true and accurate copy of Stubbs' July 15, 2005 e-mail is attached hereto as part of the string of e-mails attached as Exhibit S.

62.    On July 21, 2005, Royal Doulton made the first of its payments of the requested $328,313.00 under protest to Schenker, remitting to Schenker by wire transfer $164,156.50.  (See Exh. Q.)  In so doing, however, Royal Doulton maintained its assertion that there is no contractual basis for the contested charges addressed by that payment and that Royal Doulton made the partial payment of the contested charges under protest, reserving its right to dispute the

validity of Schenker's charges as well as its right to seek remedies for Schenker's threatened shut-down. (*See* Exh. Q.)

63.    According to Dewey's e-mail of July 15, 2005, the balance of the $328,313.00 contested charges, *i.e.*, another $164,156.50, must be paid by Royal Doulton to Schenker on or by July 28, 2005. (*See* Exh.s R, Q.)

64.    Royal Doulton has performed all of its obligations under the Agreement.

65.    Schenker, however, continues to breach its obligations to Royal Doulton, most recently reassigning the warehouse manager of the Indianapolis facility on July 18, 2005 in complete disregard of the retention fee agreement entered into between the parties on May 31, 2005. A true and accurate copy of Hickey's July 18, 2005 e-mail to Dewey regarding that breach is attached hereto as part of the string of e-mails attached as Exhibit S.

## COUNT I

## BREACH OF CONTRACT

66.    Royal Doulton adopts and incorporates by reference each and every allegation contained in Paragraphs 1 through 65 inclusive, as if fully set forth herein.

67.    The Agreement is valid and binding upon the parties.

68.    Royal Doulton has performed, tendered performance of, or has been excused from performance of, all its obligations under the Agreement.

69.    Schenker breached the Agreement by refusing to acknowledge and abide by its contractual obligations.

70.    Schenker breached the good faith provisions of the Agreement.

71.    Schenker also breached the rates and charges provisions of the Agreement.

72.    As a result, Royal Doulton has been substantially damaged.

73.    WHEREFORE, Royal Doulton requests that this Court grant the following:

A.     Judgment in favor of Royal Doulton and against Schenker in the amount of its damages arising from Schenker's breaches of the Agreement, including, but not limited to, the sum of $328,313.00, consisting of the $164,156.50 amount paid to Schenker by Royal Doulton on July 21, 2005 and the portion of the remaining balance of $164,156.50 that Royal Doulton is forced to pay Schenker, which balance Schenker asserts must be paid by Royal Doulton to Schenker on or by July 28, 2005;

B.     Award to Royal Doulton of its costs of suit (*see* 10 Del. C. § 5101 "Generally a party for whom final judgment in any civil action, or on a writ of error upon a judgment is given in such action, shall recover, against the adverse party, costs of suit, to be awarded by the court."); and

C.     Grant to Royal Doulton such other relief as the Court deems proper and just.

## COUNT II

### DECLARATORY RELIEF

74.     Royal Doulton adopts and incorporates by reference each and every allegation contained in Paragraphs 1 through 73 inclusive, as if fully set forth herein.

75.     Schenker asserts that Royal Doulton has obligations and commitments beyond those set forth in the Agreement.

76.     Royal Doulton is entitled to a Declaration that it has no obligations or commitments to Schenker other than those obligations set forth expressly in the Agreement.

77.     Royal Doulton is entitled to a Declaration that it has no further liability to Schenker other than the payments described in the Agreement.

78.     Schenker breached the Agreement and has threatened further breaches of the Agreement.

79.     WHEREFORE, in accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Royal Doulton requests that this Court enter an order declaring:

A.     Royal Doulton has no obligations or commitments to Schenker other than those obligations set forth expressly in the Agreement.

B.   Royal Doulton has no further liability to Schenker other than the payments described in the Agreement.

C.   Schenker breached and otherwise failed to abide by its contractual obligations.

D.   Royal Doulton is entitled to an award of costs of suit arising out of Schenker's failure and/or threatened failure to perform under the Agreement. *See* 10 Del. C. § 5101 "Generally a party for whom final judgment in any civil action, or on a writ of error upon a judgment is given in such action, shall recover, against the adverse party, costs of suit, to be awarded by the court.").

E.   Grant to Royal Doulton of such other relief as the Court deems proper and just.

Respectfully submitted,

By:    _____

Michael A. Weidinger (I.D. No. 3330)
Liza H. Sherman ( I.D. No. 4129)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899-2306
(302) 888-6800
(302) 571-1750  Facsimile
mweidinger@morrisjames.com

and

Adam Arceneaux (Atty. No. 17219-49)
Elizabeth T. L. Raymond (IN Atty. No. 24637-49; IL ARDC No. ARDC No. 6277862)
ICE MILLER
One American Square
Box 82001
Indianapolis, IN  46282
(317) 236-2100
(317) 236-2219 Facsimile
adam.arceneaux@icemiller.com
elizabeth.raymond@icemiller.com
*(request for pro hac vice admission pending)*

***Attorneys for Plaintiff, Royal Doulton USA Inc.***