EXHIBIT A

# Warehousing and Distribution Service Agreement

**between**

**Royal Doulton USA Inc.**

**and**

**Schenker Inc.**

1

# Contents

| Clause Number | Heading | Page |
|---|---|---|
| 1 | DEFINITIONS | 5 |
| 2 | TERM | 8 |
| 3 | APPOINTMENT OF SCHENKER TO PROVIDE THE SERVICES | 8 |
| 4 | RECEIPT OF PRODUCT | 8 |
| 5 | RECEIVING DAMAGED GOODS | 9 |
| 6 | STORAGE OF PRODUCT | 9 |
| 7 | ORDER PICKING AND DISPATCH | 10 |
| 8 | CARTAGE TO STORE AND TRANSPORTATION | 11 |
| 9 | RETURNS | 11 |
| 10 | GOOD FAITH | 12 |
| 11 | SCHENKER EMPLOYEES | 12 |
| 12 | CONTINUOUS IMPROVEMENT PROGRAM | 13 |
| 13 | PRODUCTIVITY IMPROVEMENTS | 13 |
| 14 | ACHIEVEMENT OF KPI | 14 |
| 15 | SCHENKER REPORTING REQUIREMENTS | 14 |
| 16 | MEETINGS | 14 |
| 17 | OPERATING PROCEDURES AND DISASTER RECOVERY PLANNING | 15 |
| 18 | PRODUCT INFORMATION | 15 |
| 19 | STOCK TAKE AND STOCK COUNTS | 15 |

*Royal Doulton/Schenker Agreement*

| 20 | DISPATCH ERRORS | 16 |
| 21 | ANNUAL CUMULATIVE STOCK LOSSES | 16 |
| 22 | CONTRACT RATES AND TERMS OF PAYMENT | 17 |
| 23 | RATE CHANGES, RATE REVIEW AND KPI REVIEW | 18 |
| 24 | OWNERSHIP OF PRODUCT | 18 |
| 25 | RISK AND INSURANCE | 18 |
| 26 | SUB-CONTRACTING | 19 |
| 27 | CONFIDENTIALITY | 19 |
| 28 | TERMINATION | 20 |
| 29 | INDUSTRIAL DISPUTES | 20 |
| 30 | ENGAGEMENT OF CONTRACTOR | 20 |
| 31 | LIEN | 21 |
| 32 | NON AGENCY | 21 |
| 33 | COMPLY WITH REGULATIONS | 22 |
| 34 | TECHNOLOGY | 22 |
| 35 | FORCE MAJEURE | 22 |
| 36 | DESTRUCTION OF PREMISES | 23 |
| 37 | DISPUTE RESOLUTION | 23 |
| 38 | SCHEDULES INCORPORATED | 24 |
| 39 | NOTICES | 24 |
| 40 | JURISDICTION | 24 |
| 41 | ASSIGNMENT | 24 |
| 42 | VARIATION | 24 |

*Royal Doulton/Schenker Agreement*

| 43 | HEADINGS | 25 |
|----|----------|-----|
| 44 | COSTS | 25 |
| 45 | SCHEDULE 1 | 27 |
| 46 | SCHEDULE 2 | 30 |
| 47 | SCHEDULE 3 | 31 |
| 48 | SCHEDULE 4 | 33 |
| 49 | SCHEDULE 5 | 36 |

*Royal Doulton/Schenker Agreement*

<u>Warehousing and Distribution Service Agreement</u>

This Agreement commences on the 26th day of August 2002,

between

Royal Doulton USA Inc., 701 Cottontail Lane, Somerset, New Jersey 08873, USA ("Royal Doulton"),

and

Schenker Inc., 150 Albany Avenue, Freeport, New York 11520, USA ("Schenker")


Recitals |

A.  Royal Doulton carries on the business of retailing and wholesaling the Products.

B.  Schenker stores and handles goods as a bailee for hire and has agreed to act as provider of a Distribution Center ("DC") and the Services for the term and otherwise subject to the terms and conditions set out in this Agreement.


---

| 1 | Definitions |
|---|---|

1.1    In this Agreement and in the Schedules hereto, the following expressions (unless the context otherwise requires) have the meanings respectively assigned to them:

**"Agreed Cost"** means, an amount agreed in advance in writing between Royal Doulton and Schenker in respect of any additional facility, service or resource provided under Clause 22.5 and is inclusive of all operating costs, statutory charges, fees, taxes, overheads and profit margin.

**"Annual Cumulative Stock Losses"** means

(a)    stock losses due to pilferage of any Products while on Schenker premises;

(b)    stock losses due to Products being negligently damaged by Schenker whilst being handled by Schenker Employees on Schenker property;

(c)    stock losses due to incorrect dispatch of Product by Schenker Employees; and

(d)    stock losses identified in stock takes/stock counts.

**"Bank"** means a bank authorized under the laws of the United States or any state to carry on a banking business.

**"Business Day"** means a day on which Banks are open for business in the USA state of Indiana.

**"Confidential Information"** means any information:

(a)    relating to the terms of this agreement; or

*Royal Doulton/Schenker Agreement*

(b)    relating to the Products or methods of handling goods while in the DC; or

(c)    relating directly or indirectly to research or development by accounting for the marketing or the business of either party or its customer; or

(d)    disclosed by either party to the other on the express basis that such information is confidential; or

(e)    which might reasonably be expected by either party to be confidential in nature, provided that where information relates exclusively to one party, nothing in this agreement shall require that party to maintain confidentiality in respect of that information.

**"Contract Rates"** means the rates for the Services set out in Schedule 1.

**"DC"** means distribution center.

**"Computer System"** means the Schenker computer network system, which interfaces with the Royal Doulton computer system or the Royal Doulton computer system itself.

**"Force Majeure"** means an act of God, fire, explosion, war, riots, civil commotion, restricted operation by reason of a federal, local or State Law or regulation, or any other cause beyond reasonable control of a party excluding any labor dispute, strike or lockout.

**"Information"** includes the whole or part of, and all copies and other means of reproduction or storage (whether in a visible, electronic or other form) of:

(a)    any intellectual property, including (without limitation) any option, projection, idea, concept, process, procedure, plan, design, program, study, data, report, know-how, expertise or other such property.

(b)    any document, data, statement, analysis, opinion, projection, forecast, report, note, notebook, drawing, manual, letter or any other such material in any form.

**"KPI"** means the key performance indicators to be agreed as part of the Operating Procedures manual referred to in Clause 17.

**"Operating Procedures"** means the standard operating procedures contained in the manual to be prepared by Schenker in accordance with Clause 17.

**"Premises"** means the DC at Building 48, Park 100 Business Park, 5010 W. 81st Street, Indianapolis, IN 46268 or such other location as is agreed in writing between Schenker and Royal Doulton.

**"Products"** means the ceramic or other products sold by Royal Doulton from time to time, and include any new, promotion or replacement products, which are within the same general ranges of products as the original products.

**"Royal Doulton Security Agreement"** means that certain Amended and Restated Security Agreement, dated as of April 10, 2002, by and between Royal Doulton and HSBC Investment Bank plc ("*HSBC*"), as agent and trustee (in such capacity, the "*Security Agent*"), for HSBC, as facility agent, HSBC Bank plc, as overdraft bank and FFE Bank, HSBC Asset Finance (UK) Limited and HSBC Equipment Finance (UK) Limited, as asset finance banks, and the banking and financial institutions party to the Replacement Credit Agreement described therein, as this Amended and Restated Security Agreement may from time to time hereafter be amended and modified.

**"Security Agent"** has the meaning set forth in the definition of "Royal Doulton Security Agreement" in this Clause 1.1.

*Royal Doulton/Schenker Agreement*

"**Sealed Container**" means any container sealed by tape, wrapped or similar device.

"**Services**" means the provision of a DC and warehousing and distribution services, which include, but may not be limited to:

(a)    receipt of Products into store;

(b)    storage of Products;

(c)    order picking;

(d)    packing of orders;

(e)    invoicing customers;

(f)    dispatch of Products;

(g)    cartage to store/transportation to customers;

(h)    transportation and processing of returns;

(i)    preparation and supply of standard operational documentation.

"**Standard Cost of Goods**" means the cost of the goods comprising the following charges:

(a)    list price from supplier;

(b)    freight from supplier; and,

(c)    duty.

"**Working Day**" means a day that is not Saturday, Sunday or a public holiday or bank holiday in the USA state of Indiana.

<u>Interpretation</u>

1.2    In this agreement:

(a)    All monetary amounts are stated in United States dollars, unless provided otherwise.

(b)    Where the context permits, the singular includes the plural and vice versa.

(c)    References to any "party" means a party to this Agreement and include the successors, executors, administrators and permitted assignees (as the case may be) of that party.

(d)    References to clauses and the schedules are to clauses in, and the schedules to this Agreement (unless stated otherwise).  Each such schedule forms part of this Agreement.

(e)    References to any document (however described) shall include references to that document as modified, novated, supplemented, varied or replaced from time to time as agreed in writing by the parties.

(f)    All references to legislation are (unless stated otherwise) references to USA (federal, state and local) legislation and include all subordinate legislation, any re-enactment of, or, amendment to, that legislation and all legislation passed in substitution for that legislation.

*Royal Doulton/Schenker Agreement*

(g)     References to a month or a year are references to a calendar month or calendar year.

(h)     Where the context permits, references to a "person" include an individual, firm, company, corporation or unincorporated body of persons, any public, territorial or regional authority, any government and any agency of any government or of any such authority.

## 2      Term

2.1     This Agreement remains in force for an initial term of three (3) years from the commencement date of this Agreement (the "Initial Term"), with a review after each 12-month period in accordance with clause 23.2.

2.2     This Agreement may be extended for a period of three (3) years provided that not less than six (6) months prior to the end of the initial term Royal Doulton gives Schenker written notice of its wish to extend the Agreement.  Schenker must notify Royal Doulton in writing within one (1) month of receipt of the notice if Schenker does not agree to the extension of the Agreement and the reasons for so doing.

## 3      Appointment of Schenker to Provide the Services

3.1     For the term of this Agreement Royal Doulton hereby appoints Schenker to provide the Services and a DC for Royal Doulton from the Premises and in accordance with the KPI and the terms and conditions of this Agreement.

3.2     Royal Doulton will bear the costs for the move of the Products to the DC.  Royal Doulton selected key persons will train key Schenker project personnel in the safe handling of the Products, in order to minimize damage to the Products.

## 4      Receipt of Product

4.1     Royal Doulton will direct Product to Schenker at the Premises who will unload incoming Products and receipt the delivery into the Computer System effective at the time of receipt.

4.2     Royal Doulton will supply a Two-Week Shipping Schedule and will notify Schenker of a delivery of Product not less than five (5) days prior to date of delivery to the Premises and will provide Schenker with a Packing List not less than 24 hours prior to delivery to the Premises.

4.3     Schenker will inspect, count and compare the number of all incoming Products to the packing list provided by Royal Doulton.  Schenker must submit a Goods Receipt Advice detailing the results of the inspection and count and receipt into the Computer System the Products delivered.

4.4     If Schenker notes a discrepancy in products received versus the Packing List, Schenker must notify Royal Doulton in writing within 1 working day of completion of the receipt and quarantine the Products until notified by Royal Doulton as to what action is to be taken. Royal Doulton will revert to Schenker with a decision as to what action is to be taken as soon as possible and within five (5) business days after receipt of Schenker's written notice.

4.5     Schenker must have complied with its obligations under clause 4.3 within the following time frames:

8

(a)    receipt of one 40ft shipping container must be completed within two (2) working days of delivery to the Premises;

(b)    receipt of one 20ft shipping container must be completed within one (1) working day and a half (1/2) of delivery to the Premises

(c)    receipt of two 40ft shipping containers must be completed within four (4) working days of delivery to the Premises;

(d)    receipt of two 20ft shipping containers must be completed within two (2) working days of delivery to the Premises; and

(e)    all airfreight deliveries must be completed within one working (1) day of delivery to the Premises.

4.6    Schenker must notify Royal Doulton by e-mail within 4 hours of discovering the following:

(a)    a shipping container whose seal is broken;

(b)    a shipping container whose seal states a number different from that quoted on the relevant Royal Doulton commercial invoice and shipping documentation;

(c)    a shipment displaying signs of pilferage;

(d)    a shipment displaying visible damage; and,

(e)    a shipment delivered wet.

## 5    Receiving Damaged Goods

5.1    Schenker must notify Royal Doulton in writing of any visible damage to any Container within four (4) hours of receipt of the Container, without opening the Container seal.  The Container must be quarantined until Royal Doulton advises Schenker of the course of action to be taken. Royal Doulton will revert to Schenker with a decision as to what action is to be taken as soon as possible and within five (5) Business Days after receipt of Schenker's written notice.

5.2    Schenker must notify Royal Doulton in writing of any visible damage to any Products within four (4) hours of receipt of the Products being completed (as specified within clause 4).  The Products must be quarantined until Royal Doulton advises Schenker of the course of action to be taken. Royal Doulton will revert to Schenker with a decision as to what action is to be taken as soon as possible and within five (5) Business Days after receipt of Schenker's written notice.

5.3    Notwithstanding any other provision of this Agreement it is agreed that Schenker will not be liable to Royal Doulton for the contents of Sealed Containers, which have been damaged prior to receipt at the Premises.

## 6    Storage of Product

6.1    Schenker will store the Products supplied by Royal Doulton until dispatched to a customer, or as otherwise instructed by Royal Doulton.

6.2    The Products shall be warehoused on the Premises unless Royal Doulton has agreed otherwise in writing.  If Schenker requires that the Premises be relocated for reasons not

9

*Royal Doulton/Schenker Agreement*

relating to Royal Doulton's potential or actual need for additional capacity or resource requirements, and Royal Doulton has agreed in writing to such relocation, Schenker shall be responsible for all costs associated with the relocation.

6.3    Throughout the duration of this Agreement Schenker undertakes and agrees to remain the registered proprietor or lessee of the Premises.

6.4    Schenker will maintain Royal Doulton Products quality by ensuring that:

   (a)    the Premises are maintained in a clean and orderly condition.

   (b)    all equipment within the Premises is clean, well maintained and serviced.  Operators will be adequately trained or qualified, if required, and the equipment will be operated in a safe and professional manner.  Any mobile or stationary equipment breakdowns or damage will be repaired promptly.

   (c)    product handled within the Premises will have the quality, appearance and cleanliness of its packaging maintained.

   (d)    all Products stored on pallets by Schenker will be securely and safely stacked.

   (e)    Schenker will ensure Product will be handled and stored with due care and pallets and Products are not damaged by rough treatment, neglect or exposure to external environmental conditions.

6.5    Schenker shall take all reasonable steps to ensure security at all times of the Products in the Premises.

---

## 7    Order Picking and Dispatch

7.1    Upon receipt by Schenker of orders for Royal Doulton customers through the Royal Doulton Canadian System - Trend via EDI to Schenker's HTS system, Schenker will be required to pick full pallet, case and individual unit orders.

7.2    If the order is to be consigned to any customer requiring EDI, Schenker will pack the order using ScanPack software and send the Advance Shipping Notice via EDI to Royal Doulton's Canadian System – Trend.

7.3    Schenker will produce a packing slip, invoice or electronic file for each order.

7.4    The pallets, cases and unit orders will be made ready as follows:

   (a)    with attention to placing, wherever possible, heavier Product on the bottom layers and lighter more fragile Product on the top;

   (b)    product to be delivered as a pallet will be stretch-wrapped and appropriately labeled;

   (c)    a customer invoice will accompany each packed order unless otherwise advised by Royal Doulton;

   (d)    pallets will not be stacked on top of each other without some method provided to support the upper pallet completely from the one beneath it; and,

   (e)    all precautions will be taken in preparing the consignment for transport and securing the load against damage during the journey.

*Royal Doulton/Schenker Agreement*

| 8 | **Cartage to Store and Transportation** |
|---|---|

8.1    If Royal Doulton is in a relationship with the third party carriers then Royal Doulton shall be responsible to any third party carrier for amounts due to the carriers. If Schenker undertakes to be responsible for the cartage to store and transportation of any orders to customers and distributors then Schenker shall be responsible to any third party carrier with which Schenker contracts in its own name for amounts due to the carrier and shall invoice Royal Doulton for reimbursement of such costs in accordance with Clause 22 unless the cost of cartage to store/transportation is to be borne by Royal Doulton's customer.  In such cases Schenker must advise the third party carrier and the third party carrier shall invoice the customer direct. If the customer fails to pay the third party carrier's invoice and the charges are reversed to Schenker, then Schenker may invoice Royal Doulton for those charges.

8.2    The transfer of Products between Schenker and the customer or distributor will be accurately recorded, documented and verified by the party taking charge of, and the party relinquishing, the responsibility for the Products.  The location where this transfer normally takes place will be referred to in this Agreement as the Transfer Point.

8.3    Order releases received by Schenker prior to 4.30pm Monday to Friday will be staged for pick up by the end of business hours within the following two (2) Business Days.

8.4    Order releases received by Schenker prior to 1:00pm Monday to Friday will be staged for pick up by the end of business hours on the following Business Day.

8.5    If Schenker shall be responsible for the cartage to store/transportation of all orders to customers and distributors and if requested by Royal Doulton Schenker must notify Royal Doulton within one (1) working day if a proof of delivery document in relation to an order is in existence.

8.6    If Schenker shall be responsible for the cartage to store/transportation of all orders to customers and distributors and if a proof of delivery document exists Schenker must provide Royal Doulton with a hardcopy of the document, provided that the relevant order was dispatched within the two (2) months prior to the date of Royal Doulton's request for the proof of delivery document.

| 9 | **Returns** |
|---|---|

9.1    Royal Doulton shall:

(a)    advise Schenker of returns including: customer name, address, contact, telephone number and Return Goods Authority Number; and

(b)    ensure that a Return Goods Authority Document is supplied to Schenker in advance of receipt of each return.

9.2    If Schenker is requested to coordinate the transportation of orders from Royal Doulton customers to the DC by Royal Doulton, the organization of transportation from Royal Doulton customer's premises to the DC will be completed within 24 hours of the receipt of Royal Doulton's e-mailed request.

9.3    Schenker shall be responsible for the processing of all returns for any reason of Products by Royal Doulton customers, as follows:

(a)    within five (5) Business Days of arrival of returns shipment at the DC: confirming receipt and piece count; and

(b)    within ten (10) Business Days of arrival of returns shipment at the DC:

(i)     accurate completion of a Goods Receipt Advice for each return; and

(ii)    removal of Royal Doulton customer's labels and tickets, if attached to the Products on return to the DC.

## 10      Good Faith

10.1    Each party shall at all times deal with the other party in good faith, and shall do such things as shall be incidental to, and reasonably for, the provision of the Services.

10.2    Each party shall not, during the term of this agreement, knowingly or recklessly do anything, which might damage or bring into disrepute the other party's reputation, products or customers.

10.3    Each party shall nominate contact persons who will be in charge for the day-to-day operational matters. In addition both parties shall make available contact numbers of such persons as well as contact persons for escalation to in the event of absence and issues that require immediate resolution.

## 11      Schenker Employees

Schenker agrees that it will:

(a)    Employ competent workers and provide them with adequate supervision, full and proper instructions and training so as to ensure the proper handling of the Products and of any equipment necessary to perform its obligations pursuant to this Agreement.

(b)    Upon mutual consent between the parties Schenker may approach the personnel employed by Royal Doulton for the purposes of negotiation of employment with Schenker prior to this agreement being ratified between the two parties. Royal Doulton may advise Schenker as to personnel in its employ who may be suitable for this type of approach however Schenker is under no obligation to approach these personnel if it does not consider them as suitable for its own employment.

(c)    Ensure that its agents, employees and subcontractors will at all times during this Agreement skillfully and diligently provide the Services and shall comply with all reasonable and lawful directions given by or on behalf of Royal Doulton and will use its best endeavors not to jeopardize or damage the business of Royal Doulton.

(d)    Schenker shall at all times conduct operations in a manner to avoid risk or harm to persons.

(e)    Schenker shall continuously inspect their working practices to discover and determine any dangerous conditions and shall be responsible for the discovery, determination and rectification of any such dangerous conditions and the correctness of any and all equipment. Work shall comply with all applicable safety laws, standard codes and regulations in the USA and the applicable state of the USA in which the work is conducted.

(f)     Equipment owned by Royal Doulton that may be used by Schenker in the performance of the obligations under this contract remains the property and responsibility of Royal Doulton. All equipment shall comply with all applicable safety laws, standard codes and regulations in the USA and the applicable state of the USA

in which the work is conducted. Schenker shall continuously inspect this equipment to discover and determine any conditions that may risk or cause harm to persons or risk of damage to the equipment/product and upon notification from Schenker, Royal Doulton shall be responsible for the rectification of any such conditions and the correctness of this equipment.

(g)    Inform employees and duly follow any special instructions given by Royal Doulton for handling specific Products.

## 12    Continuous Improvement Program

A Continuous Improvement Program is to be undertaken to ensure that a process is in place to generate improvement in the cost and service of the Schenker operations. The Continuous Improvement Program must have the following elements:

(a)    It must identify one area of cost improvement and one area of service improvement annually. The areas selected may involve internal and/or external suppliers or customers. The areas chosen will be at the discretion of Schenker but must not be trivial in nature and must be capable of providing a reasonable impact on the Services.

(b)    For each improvement area selected, a measurement system will be developed by Schenker that will indicate the performance achievement of the operational team in the selected area. The performance will be graphed and displayed in a prominent location within the Premises. Operators should be involved by Schenker in the measurement process and be encouraged to suggest ways to improve performance.

(c)    Schenker should encourage the operational teams to set their own improvement goals.

(d)    Royal Doulton and Schenker will review the progress of the operational teams in the selected areas on a quarterly basis.

## 13    Productivity Improvements

13.1    Productivity improvements must be actively pursued in an effort to reduce costs. Royal Doulton will work with Schenker on productivity improvements where appropriate.

13.2    Schenker is to give written notice to Royal Doulton of:

(a)    the exact nature of any potential cost improvements that may result from productivity improvements or directly from Schenker's Continuous Improvement Program;

(b)    whether any material dollar investment will be required and, if so, by whom and in what amounts;

(c)    the date of the successful realization of the cost improvement; and

(d)    the dollar amount of the annualized cost improvement.

13.3    Any cost improvements that result from productivity improvements or directly from Schenker's Continuous Improvement Program, which:

(a)    require no material dollar investment from either party in order to realize the intended benefit, will reduce the Contract Rates with effect from the month following the

13

successful realization of the cost improvement. When the cost improvement has been realized for a period of 12 consecutive months and the full amount of such cost improvement has been applied to reduce the Contract Rates, Schenker shall submit a one time invoice, together with appropriate supporting documentation, to Royal Doulton in an amount equal to 50% of the annualized cost improvement. Royal Doulton shall make payment of the invoice to Schenker in accordance with clause 22.4;

(b)     require a material dollar investment by either party, shall be subject to separate negotiation and agreement prior to implementation.

---

## 14     Achievement of KPI

14.1     Schenker agrees to provide KPI results by the close of business on the tenth working day of each month. KPI provided will be reviewed with Royal Doulton in the Monthly Operational Meetings (see Clause 16).

14.2     If Schenker fails to achieve the KPI overall monthly target for two consecutive months Royal Doulton may issue Schenker with a written notification seeking an explanation of the causes and corrective actions Schenker intends to take to rectify the failure, and Schenker shall respond to Royal Doulton in writing within ten (10) business days after its receipt of such written notification.

14.3     Failure to achieve any KPI for three consecutive months is to be discussed at the next Quarterly Management Meeting (see Clause 16) and a detailed recovery plan is to be agreed and implemented immediately.

---

## 15     Schenker Reporting Requirements

Schenker must prepare and submit a written report covering the matters set out in the table below no later than the tenth working day of the month following the respective period at the Monthly Operational Meeting or Quarterly Management Meeting:

| Topic | Weekly | Monthly | Quarterly |
|---|---|---|---|
| Performance against KPI | X | X | X |
| Warehouse Productivity (if appropriate) | | | X |
| Continuous Improvement (if appropriate) | | | X |
| Stock Losses for Period & Cumulative (if appropriate) | X | X | X |

---

## 16     Meetings

16.1     The parties will attend an operational meeting at a mutually convenient time and place not less than once a month or as mutually agreed. At a minimum the Director of Operations: North America from Royal Doulton and the Third Party Logistics Branch Manager from Schenker will be present at the operational meeting.

16.2     The parties will attend a management meeting at a mutually convenient time and place not less than once a quarter or as mutually agreed. At a minimum the Director of Operations:

14

*Royal Doulton/Schenker Agreement*

North America from Royal Doulton and the Regional Vice President and Vice President, Integrated Supply Chain Solutions from Schenker will be present at the management meeting.

## 17    Operating Procedures and Disaster Recovery Planning

17.1    Within three (3) months of the commencement date of this Agreement Schenker must provide Royal Doulton with a manual detailing the operating procedures for the Services. The following procedures are considered essential for inclusion in the Operating Procedures manual:

(a)    Introduction;

(b)    Procedures for receipt and put away of new stock;

(c)    Procedures for picking, packing and dispatching orders;

(d)    Procedures for arranging transportation and processing returns;

(e)    Contact with Royal Doulton Customer Service;

(f)    Training of new staff;

(g)    Operations reporting and KPI;

(h)    Stock take procedures;

(i)    Back-up (contingency) procedures.

17.2    Royal Doulton may at its expense, audit the Operating Procedures to ensure compliance.

17.3    The Operating Procedures manual becomes effective when mutually agreed.

17.4    Schenker, prior to the commencement date of this agreement, will provide a disaster recovery plan addressing operational and IT systems.

## 18    Product Information

Each party shall, immediately upon becoming aware of any adverse publicity or threatened or pending legal proceedings in respect of the Products or of any other information, which might adversely impact upon the goodwill associated with Royal Doulton or any Products, notify the other party accordingly.

## 19    Stock Take and Stock Counts

19.1    Schenker is to perform stock takes/stock counts in accordance with the Operating Procedures manual or as mutually agreed and at no additional cost to Royal Doulton. Any discrepancies greater than 10 units are to be investigated at Schenker's convenience, but in any case within seven (7) days of the date of the stock take/stock count. Any such discrepancies not resolved are to be reported in the monthly KPI.

*Royal Doulton/Schenker Agreement*

19.2    If Royal Doulton requires a stock take/stock count outside of normal working hours, then Schenker will provide Royal Doulton with a quote for additional resources/services not covered by Schedule 1.

19.3    Royal Doulton shall be entitled to request and receive details of the stock take plan no less than seven (7) days prior to the date of the stock take. If Royal Doulton is unsatisfied with any aspect of the plan it shall in writing notify Schenker of the issues no less than five (5) days before the date of the stock take. Schenker shall implement any reasonable amendments Royal Doulton may make to the plan.

## 20    Dispatch Errors

20.1    Schenker will be responsible for the cost of collection and replacement of stock, which is incorrectly dispatched due to the fault of Schenker and is not retained by the customer.

20.2    Each month Royal Doulton will calculate and agree with Schenker the value of the stock lost as a result of incorrect dispatch as under clause 20.1 for the previous month.

20.3    Based on the incidents agreed upon in accordance with Clause 20.2 Schenker will credit the next month's invoice for any transport costs associated with such losses that Schenker has already invoiced Royal Doulton.

20.4    The value of any Product unrecoverable as a consequence of incorrect dispatch as under clause 20.1 will be included in the Annual Cumulative Stock Losses to date.

20.5    Any amounts charged to Royal Doulton by Royal Doulton customers shall be reviewed by the Director of Operations: North America from Royal Doulton and the Third Party Logistics Branch Manager from Schenker at the Monthly Operational Meeting. The parties shall agree the amount that is attributable to the part of the warehousing and distribution operation that is managed by Schenker and is to exclude those amounts relative to orders that were urgently expedited at the request of Royal Doulton (the "Charge Back Amount"). If the parties fail to agree the monthly Charge Back Amount, the matter shall be referred to the Group Warehousing Executive from Royal Doulton and the Vice President, Integrated Supply Chain Solutions from Schenker.

20.6    Royal Doulton agrees that the total allowable amount of Charge Back Amount for the first twelve (12) months of this Agreement is set at US $80,000 (the "Charge Back Allowance"). No less than two (2) months prior to the Review Date Royal Doulton must provide Schenker with the new Charge Back Allowance Royal Doulton proposes. Following receipt of the proposed Charge Back Allowance the parties shall negotiate the new Charge Back Allowance. The reviewed Charge Back Allowance will apply from the Review Date. If the parties fail to reach agreement by the Review Date the provisions of Clause 37 shall apply.

20.7    If, over a twelve (12) month period, the Charge Back Amount exceeds 125% (one hundred and twenty-five percent) of the Charge Back Allowance, Schenker will credit the next invoice by the value of the Charge Back Amount exceeding 125% of the Charge Back Allowance.

20.8    If, over a twelve (12) month period, the Charge Back Amount is less than 75% (seventy-five percent) of the Charge Back Allowance, Schenker will add an amount to the next invoice which is equal to 75% of the Charge Back Allowance less the Charge Back Amount.

## 21    Annual Cumulative Stock Losses

21.1    Each month Schenker and Royal Doulton will calculate the value of the Annual Cumulative Stock Losses to date. The amount will be included in Schenker's monthly report. Clauses

*Royal Doulton/Schenker Agreement*

21.1 & 21.2 will only apply after the initial stock take, which will take place when mutually agreed between both parties.

21.2    In the event of clause 21.1 being applicable, following the operations meeting immediately before the end of Royal Doulton's financial year:

(a)    if the Annual Cumulative Stock Losses identified during the stock take/stock counts and general operations, are above 0.5% (half of one percent) of the average dollar amount of Products held at the Premises over a twelve (12) month period, Schenker will credit the next invoice by the value of the losses exceeding 0.5% (half of one percent) of the average dollar amount of Products held at the Premises over the same twelve (12) month period;

(b)    if the Annual Cumulative Stock Losses are less than 0.5% of the average dollar amount of Products held at the Premises over a twelve (12) month period, the difference between 0.5% of the average dollar amount of Products held at the Premises over the same twelve (12) month period and the actual Annual Cumulative Stock Loss will be added to 0.5% of the average dollar amount of Products held at the Premises over the following twelve (12) month period and the new amount will be allowed during the following twelve (12) month period of the Agreement;

(c)    the value of the losses will be determined using the Standard Cost of Goods; and

(d)    the twelve (12) month period referred to in this clause may cover a period shorter than twelve (12) months during the first year of the Agreement.

## 22    Contract Rates and Terms of Payment

22.1    Royal Doulton shall pay Schenker for the Services as is determined in accordance with the Contract Rates.

22.2    Schenker must invoice Royal Doulton by the fourth (4th) working day of each calendar month for the Services rendered during the previous month (the "invoice").

22.3    Each invoice must be correctly addressed and must include the following information:

(a)    date of invoice

(b)    details of the Services provided

(c)    the period during which the Services were provided

(d)    the amount claimed for each Service; and

(e)    the total amount claimed.

22.4    Royal Doulton shall make payment to Schenker of Schenker's accounts within 15 days after receipt of invoice for the preceding month.

22.5    If Schenker is requested to provide Royal Doulton with facilities, services or resources in addition to the Services, Schenker shall submit to Royal Doulton a quotation relating to the additional services. If Royal Doulton accepts the quotation Schenker shall perform the additional services and Royal Doulton shall pay Schenker the quoted amount following receipt of an invoice in accordance with clause 22.4.

*Royal Doulton/Schenker Agreement*

| 23 | Rate Changes, Rate Review and KPI Review |
|----|------------------------------------------|

23.1   Royal Doulton will to the best of its ability, keep Schenker informed of Product volume variations, however, if volumes over a calendar year as compared with the volumes set out in Schedule 2 increase or decrease by more than 10%, either party is entitled to negotiate in good faith new rates for the provision of the Services having regard to proposed volumes.

23.2   On each anniversary of the commencement date of this Agreement, the Contract Rates shall be reviewed by the parties (the "Review Date"). No less than two (2) months prior to the Review Date Schenker must provide Royal Doulton with the new Contract Rates Schenker proposes. Any claim for increases in the Contract Rates must be substantiated by effective evidence of cost increase, and a demonstration that all possible actions have been taken to offset these increases. Following receipt of the proposed Contract Rates the parties shall negotiate the new Contract Rates, provided always that the increases in the Contract Rates will not exceed the total value of any reasonable increases in the cost of operation and must take into account any cost efficiencies obtained by Schenker. The reviewed Contract Rates will apply from the Review Date. If the parties fail to reach agreement by the Review Date the provisions of Clause 37 shall apply.

23.3   On the Review Date the parties will review the KPI based on Schenker's performance against KPI for the previous year. Not less than two (2) months prior to the Review Date the parties shall meet to agree on the revised KPI. If the parties fail to reach agreement by the Review Date the provisions of Clause 37 shall apply.

| 24 | Ownership of Product |
|----|----------------------|

Royal Doulton, as the owner of the Product hereby agrees to deposit the Product with Schenker as bailee. The Product shall remain the property of Royal Doulton and shall be stored separately from the goods of third parties and identified as the property of Royal Doulton.

Royal Doulton has the right of access to the area holding Royal Doulton Stock within regular business hours.

| 25 | Risk and Insurance |
|----|--------------------|

25.1   Except in the case of Annual Cumulative Stock Losses as provided in Clauses 20 and 21, Royal Doulton is responsible for the physical loss and damage of the Products while in the DC.

25.2   Risk of loss and damage to Product during cartage to store/transport will be borne by Royal Doulton.

25.3   There is no obligation on Schenker to insure the Product.

25.4   Schenker must at all times during the term of this Agreement obtain and keep in force all necessary insurances required for the operation of the DC including but not limited to building and property insurance, public liability insurance and workers compensation insurance. Schenker will on request from time to time by Royal Doulton provide to Royal Doulton evidence of the currency of all such insurance policies.

25.5   Neither party is liable to the other party under this Agreement for any consequential loss or damage whether caused by negligence or otherwise.

*Royal Doulton/Schenker Agreement*

| 26 | **Sub-Contracting** |
|----|----|

26.1   Subject to clause 26.2, Schenker shall not appoint subcontractors to discharge its obligations under this Agreement, except with the prior written consent of Royal Doulton, which consent may be withheld at Royal Doulton's absolute discretion.

26.2   Schenker shall be entitled to subcontract its obligations in relation to cartage to store/transport of the Products to third party carriers approved by Royal Doulton.

26.3   Where a subcontractor is used by Schenker in accordance with this Clause, Royal Doulton shall not be deemed to have accepted any liability to that subcontractor by reason only of having given consent to the use by Schenker of a subcontractor.

| 27 | **Confidentiality** |
|----|----|

27.1   Each party shall maintain as confidential at all times, and shall not at any time, directly or indirectly:

    (a)   disclose or permit to be disclosed to any person; or

    (b)   use for itself; or

    (c)   use to the detriment of other party any Confidential Information except;

        (i)   as required by law; or

        (ii)   as is already or becomes public knowledge, otherwise than as a result of a breach by the party disclosing or using that Confidential Information of any provision of this Agreement; or

        (iii)   as authorized in writing by the other party; or

        (iv)   to the extent reasonably required by this Agreement (and, without limiting the effect of this clause, a party may disclose Confidential Information only to such of its officers, employees or professional adviser, on a "need to know" basis, as is reasonably required for the implementation of this Agreement and who shall be bound by confidentiality obligations no less restrictive than those contained in this Agreement).

27.2   On the expiry or earlier determination of this Agreement each party shall immediately return all original and copy versions of the other party's Confidential Information in its possession and control.

27.3   The parties agree that the obligations under this Clause 27 shall continue despite any termination of this Agreement or any return of Confidential Information pursuant to Sub-Clause 27.2 but that if and to the extent that any information forming part of the Confidential Information;

    (a)   is or becomes publicly known or available through no wrongful act or breach of this Agreement by a party; or

    (b)   is independently and rightfully received from a third party and was not improperly obtained from the party to which it relates; or

*Royal Doulton/Schenker Agreement*

(c) is required to be disclosed by law or pursuant to any enquiry or by any government official or regulatory body; or

(d) was lawfully in a party's possession (as evidenced by its written records) prior to its disclosure,

then, and to that extent only, the obligation not to disclose shall cease to have effect.

---

## 28    Termination

28.1    Either party may terminate this Agreement immediately if the other party is declared insolvent, placed in receivership, has a liquidator appointed or makes a general assignment for the benefit of creditors.

28.2    Either party may terminate this Agreement on giving not less than six (6) months notice, if:

(a) the other party commits a material breach of this Agreement, and if the breach is capable of remedy and fails to remedy the breach within one (1) month of written notification of the breach; or

(b) the other party commits a material breach of this Agreement, which is not capable of remedy.

28.3    Royal Doulton may terminate this Agreement on giving not less than six (6) months notice where there is a failure by Schenker to meet the KPI overall monthly target for a period of four (4) or more months in any twelve (12) month period or where there is a failure by Schenker to meet the same specific KPI goal for a period of four (4) or more consecutive months in any twelve (12) month period.

28.4    In the event that the Agreement is terminated in accordance with any of the provisions of this Clause, Royal Doulton shall:

(a) retain no right of lien over that equipment owned and operated by Schenker;

(b) pay to Schenker the Contract Rates for the work performed up to the date of termination, subject to appropriate set-offs and credits.

---

## 29    Industrial Disputes

Schenker will at all times, use its best endeavors to maintain harmonious industrial relations with its employees, and will inform Royal Doulton, within reasonable time, and in any event within 24 hours of official notification, of any impending interruptions to the performance of this Agreement.

---

## 30    Engagement of Contractor

If for any reason, (including but not limited to those referred to in Clause 29 and Clause 36 of this Agreement and excluding those referred to in Clause 28) Schenker is unable to promptly, through its employees, agents, permitted subcontractors or any other person, perform its obligations under this Agreement for a period in excess of five (5) working days, Royal Doulton may suspend this Agreement and immediately following written notice to Schenker shall be entitled to engage a contractor ("Contractor") to collect all or part of the Products from

the Premises to enable the Contractor to perform the Services from an alternative location. Schenker agrees that it will deliver the Products to the dock of the Premises within 48 hours of a request from Royal Doulton.

---

**31      Lien**

31.1    Schenker hereby agrees and undertakes that it will only exercise its lien rights hereunder in the following cases:

(a)    this Agreement is terminated for any reason and an amount due to Schenker from Royal Doulton for services, which have been charged in accordance with the Contract Rates or Clause 22.5, remains outstanding; or

(b)    Royal Doulton is declared insolvent, placed in receivership, has a liquidator appointed or enters into any arrangement with its creditors.

In all other circumstances Schenker agrees to waive any lien rights.

31.2    Schenker acknowledges:

(a)    that Royal Doulton has heretofore granted to the Security Agent, pursuant to the terms of the Royal Doulton Security Agreement and as security for the Secured Obligations (as defined therein), a security interest in, among other property, all Products now or hereafter delivered to Schenker under this Agreement and any and all proceeds thereof; and

(b)    that it is a condition precedent to the power and authority of Royal Doulton to execute, deliver and perform its obligations under this Agreement that Schenker shall have executed and delivered to the Security Agent a bailee agreement substantially in the form of Schedule 5 annexed hereto (the "*Bailee Agreement*").

31.3    Schenker further agrees:

(a)    that this Agreement and its contents may be disclosed by Royal Doulton to the Security Agent, anything in Clause 27 or elsewhere in this Agreement to the contrary notwithstanding; and

(b)    that, contemporaneously with the execution of this Agreement, Schenker will execute and deliver to the Security Agent the Bailee Agreement.

---

**32      Non Agency**

---

32.1    Nothing in this Agreement shall constitute or be deemed to constitute either party as the agent or employee of the other party for any purpose whatsoever and neither party shall have any authority or power to bind or to contact in the name of or create a liability against the other in any way or for any purpose whatsoever.

32.2    Schenker is solely responsible for workers' compensation insurance, occupational superannuation, long service leave, sick leave and all other employment related benefits in respect of its employees and owner drivers and Royal Doulton shall have no liability in this regard whatsoever.

*Royal Doulton/Schenker Agreement*

| 33 | **Comply with Regulations** |

Schenker acknowledges that in providing the Services under this Agreement, it shall comply with all Federal, State, semi-government and local Government statutes, ordinances, notices, orders or regulations and shall at all times carry out the Services under this Agreement in a safe manner.

| 34 | **Technology** |

34.1   Schenker agrees that at all times it will make itself aware of available new technology and systems and assess whether the installation of such new technology and systems would result in Royal Doulton and/or Schenker remaining competitive in the cost and service of Product distribution and in Royal Doulton's customers' requirements being more effectively met.

34.2   No such technology of systems shall be installed and implemented unless and until the parties shall have first agreed upon:

(a)   the costs of installation and implementation;

(b)   the extent, if any, to which each party will benefit therefrom; and

(c)   their respective responsibilities for such installation and implementation costs.

34.3   Notwithstanding the payment of implementation costs by Royal Doulton, Schenker and/or its third party suppliers retain all right, title and interest in any technology or other intellectual property used or developed in connection with this Agreement.  Royal Doulton shall receive no rights of any kind in any such technology or other intellectual property except as expressly provided in this Agreement.

| 35 | **Force Majeure** |

35.1   Neither party shall be held responsible if it is unable, wholly or in part, by reason of Force Majeure, to carry out any obligation under this Agreement provided the effected party:

(a)   gives the other party prompt notice of the Force Majeure with reasonably full particulars and, in so far as known, the probable extent to which it will be unable to perform or be delayed in performing the obligation; and

(b)   uses all reasonable diligence to remove the Force Majeure as quickly as possible.

35.2   If a party remains unable to perform its obligations under this Agreement by reason of Force Majeure for a period in excess of five (5) working days either party can suspend this Agreement by written notice to the other party and Royal Doulton shall be entitled to engage a Contractor in accordance with Clause 30.

35.3   In the event a party remains unable to perform its obligations under this Agreement by reason of Force Majeure for a period in excess of three (3) months either party can terminate this Agreement by written notice to the other party.

22

*Royal Doulton/Schenker Agreement*

**36    Destruction of Premises**

If during the term of this Agreement, the Premises or any material part of the Premises are destroyed so as to be totally or partially unfit for occupation and use, the whole or a fair proportion of the Contract Rates according to the nature and extent of the damage sustained will be suspended until the Premises is rendered fit for use. If the Premises is not reinstated within two (2) weeks from the date the damage or destruction occurred or if an alternative DC acceptable to Royal Doulton is not made available by Schenker, then at or after the expiration of such period and until reinstatement this Agreement may be terminated at the option of either party by notice in writing to the other party.

**37    Dispute Resolution**

37.1    The parties agree that any dispute that arises in relation to this Agreement will be dealt with in accordance with Clause 37.

37.2    If a dispute arises out of or relates to this Agreement, or the breach, termination, validity or subject matter thereof, or as to any other claim in tort, in equity or pursuant to any domestic or international statute or law a party may issue the other party with a notice of dispute ("Notice of Dispute").

37.3    Upon the issue of a Notice of Dispute in accordance with this Clause, the parties shall give written notice to the other party, designating a representative of that party to act in negotiations relating to the dispute who shall have sufficient authority to settle the dispute. The designated persons of each party shall within fifteen (15) days of the date of the Notice of Dispute carry out whatever investigations each deems appropriate to seek a resolution of the dispute.

37.4    If the dispute is not resolved within twenty (20) days from the date of the Notice of Dispute (or within such further period as the representatives may agree to be appropriate) the parties in dispute shall within a further ten (10) days (or within such further period as the representatives may agree to be appropriate) seek to agree on a process to resolve the whole or part of the dispute through means other than litigation or arbitration, such as further negotiations, mediation, conciliation, independent expert determination or mini-trial and also seek to agree on:

(a)    the procedure and timetable for any exchange of documents and other information relating to the dispute;

(b)    procedural rules and timetable for the conduct of the selected mode of proceedings;

(c)    a procedure for compensation of any neutral person who may be employed by the parties in dispute; and

(d)    whether the parties should seek the assistance of a dispute resolution organization.

37.5    The parties acknowledge that the purpose of any exchange of information or documents or the making of any offer or settlement pursuant to this Clause, is to attempt to settle the dispute between the parties. No party may use any information or documents obtained through the dispute resolution process established by this Clause for any purpose other than in an attempt to settle a dispute between the parties to this Agreement. After the expiration of the time established by, or agreed to under this Clause, any party, which has complied with the provisions of this Clause, may in writing terminate the dispute resolution process provided for herein and may then exercise such rights and remedies as may be available to such party under law or equity, including the commencement of court proceedings.

37.6    The provisions of this Clause shall not prevent:

    (a)    a party seeking urgent interlocutory relief;

    (b)    a party terminating this Agreement in accordance with Clause 28; or

    (c)    Royal Doulton appointing a contractor under Clause 30.

## 38    Schedules Incorporated

Royal Doulton and Schenker acknowledge and agree that the Schedules annexed hereto are incorporated herein and form part of this Agreement.  In the event of a conflict between the terms of this Agreement and the terms of the Schedules, the terms of this Agreement shall prevail.

## 39    Notices

Any notice to be given by either party shall, unless otherwise agreed, be in writing and may be given or served either personally or by courier, or by registered mail to the other party's address as stated herein or such other address as the recipient may from time to time notify in writing for the service of notices.  Courier notice is effective one (1) Working Day after delivery to the courier and registered mail notice is effective three (3) Working Days after deposit in the United States mails.

## 40    Jurisdiction

This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware without regard to its conflicts of laws provisions.  The parties hereby consent to the jurisdiction of the state and federal courts situated in the state of Delaware to the exclusion of all other jurisdictions in any proceeding arising from or related to this Agreement. The parties waive the right to a trial by jury in any such proceeding.

## 41    Assignment

Neither party may assign the benefit or burden of this Agreement without the prior written consent of the other party, which shall not be unreasonably withheld.

## 42    Variation

42.1    Variations to or departure from the condition of this Agreement will be agreed in writing between the two parties.  Such variation will be taken as a formal amendment to this Agreement and enforceable as such, subject to any imposed time limitations.

42.2    No time, indulgence, representation, statement or other communications by or on behalf of any party shall be effective to derogate from or override the provisions of this Agreements unless the same is in writing duly executed by the parties hereof.

*Royal Doulton/Schenker Agreement*

42.3    Each of the Clauses hereof shall be read and construed and shall have effect as a separate and severable and independent Clause and shall be enforceable accordingly.

42.4    If any part or parts of these conditions are unlawful or become unlawful during the term of the Agreement, then those part or parts, to the extent to which they are unlawful, but no further, shall be deemed to be deleted from this Agreement, but the remainder of these conditions shall continue to have full force and effect.

42.5    All the rights, liabilities and limitations of liability in these conditions shall continue to have full force and effect in all circumstances and notwithstanding any breach of the Agreement or any conditions hereof by either party.

## 43      Headings

The headings contained in this Agreement do not form part of this Agreement and are for reference only.

## 44      Costs

Each party shall pay its own costs in relation to the preparation, negotiation and execution of this Agreement.

*Royal Doulton/Schenker Agreement*

**Signed** for and on behalf of                    )
**Royal Doulton USA Inc.**                         )

_____
Signature

**R.B. McKERRALL**
VICE PRESIDENT, FINANCE
AND ADMINISTRATION
_____
Name

_____
Date

**Signed** for and on behalf of                    )
**Schenker Inc.**                                   )

_____
Signature

_____
Name

_____
Date

26

*Royal Doulton/Schenker Agreement*

**45    SCHEDULE 1**

## Contract Rates for Royal Doulton USA Inc. Warehousing & Distribution

| From: | Schenker Inc. | | | Date: | 06-May-02 |
|-------|---------------|--|--|-------|-----------|

| Currency | | Location | Size (sq/ft) | Size (m2) |
|----------|--|----------|--------------|-----------|
| US $ | | Indianapolis | 52,800 | 4,905 |

| RECURRING FEES: | Quantity | Unit of Measure | Unit Price | Amount/Month | Amount/Year |
|-----------------|----------|-----------------|------------|--------------|-------------|
| Fixed: | | | US $ | US $ | US $ |
| Warehouse Rent (base cost) | 52,800 | sq/ft | 0.37 | 19,536 | 234,432 |
| Office Rent (utilities included) | 225 | sq/ft | 1.20 | 270 | 3,240 |
| Information Technology | | | | | |
| Maintenance | | | | | |
| Warehouse Manager | 1 | hr | 37.50 | 6,500 | 78,000 |
| Administration Staff | 2 | hr | 20.00 | 6,933 | 83,200 |
| IT support | 1 | hr | 30.00 | 2,600 | 31,200 |
| Warehouse Supervisor | 2 | hr | 30.00 | 10,400 | 124,800 |
| W/H Operatives (Permanent/Full-time) | 27 | hr | 16.00 | 74,880 | 898,560 |
| Other 1 | | | | | |
| Other 2 | | | | | |
| Variable: | | | | | |
| Temporary help | 10% | hr | 16.00 | 7,488 | 89,856 |
| Warehouse Operatives - Overtime Hours | 10% | hr | 24.00 | 11,232 | 134,784 |
| Electricity | 52,800 | sq/ft | 0.04 | 2,112 | 25,344 |
| Heating/Air Conditioning | 52,800 | sq/ft | 0.03 | 1,584 | 19,008 |
| Insurance | 52,800 | sq/ft | 0.03 | 1,584 | 19,008 |
| Material Handling Equipment | 52,800 | sq/ft | 0.05 | 2,640 | 31,680 |
| Profit margin | 52,800 | sq/ft | 0.08 | 4,224 | 50,688 |
| Delivery Order | | | | | |
| Information Technology | | | | | |
| Packaging Materials & Supplies | | | | | Billed at cost |

**TOTAL RECURRING FEES**                                    151,983    1,823,800

| SET-UP COSTS: | Quantity | Unit of Measure | Unit Price | Responsibility | Amount |
|---------------|----------|-----------------|------------|----------------|--------|
| | | | US $ | | US $ |
| Handling Equipment | | | | | |
| Plant & Equipment * | 1 | Racking system | 263,385 | Schenker | 263,385 |
| Information Technology | 1 | H.T.S. system | 125,000 | Schenker | 125,000 |
| Office Equipment | | | | | |
| Structural Modifications | | | | | |
| Removal Trucking Costs | | | | | |
| Consultancy | | | | | |
| Contingency Allowance | | | | | |
| Other 1 | | | | | |
| Other 2 | | | | | |

\* As per attached specification by Crown Equipment Corporation/UNARCO

**TOTAL INVESTMENT TO BE AMORTIZED OVER 3 YEARS**          388,385

| | Amount/Month | Amount/Year |
|--|--------------|-------------|

**TOTAL SET-UP COSTS**                                     10,788    129,462

**TOTAL CONTRACT RATES**                                   162,772    1,953,262

27

*Royal Doulton/Schenker Agreement*

### An Engineered Product Delivery System by
### Crown Equipment Corp. / UNARCO

| Item # | Qty | Description | Wt. | Ext. Wt. | Unit Price | Extension |
|---|---|---|---|---|---|---|
| 1 | 945 | P12X3 75 AB<br>Anchors ½ x 3 ¾ | 0.20 | 189.00 | $0.40 each | $ 378.00 plus tax |
| 2 | 331 | L01 32 24042 S000S<br>Uprt. Frm. 240 x 42 | 146.08 | 48,352.48 | $86.99 each | $ 28,793.69 plus tax |
| 3 | 2,994 | GF2 4550 144 0SSS0<br>Step Beam 144 x 5 ½ | 45.37 | 135,837.78 | $22.86 each | $ 68,442.84 plus tax |
| 4 | 176 | CBC 012.00P<br>BACK-TO-BACK SPACER | 1.24 | 218.24 | $2.04 each | $ 359.04 plus tax |
| 5 | 71 | C24 NP 018 S<br>IMPACT PROTECTOR | 14.27 | 1,013.17 | $13.34 each | $ 947.14 plus tax |
| 6 | 336 | GF 6418 144 0SSA0<br>Step Beam 144 x 4 3/16 | 35.30 | 11,860.80 | $20.46 each | $ 6,874.56 plus tax |
| 7 | 2,688 | RT 2435 ST 091<br>Rhino Trac x 91" | 31.78 | 85,424.64 | $30.34 each | $ 81,553.92 plus tax |
| 8 | 2,688 | XHANG BKT<br>Pair / Hanger Bkts | | | $6.20 each | $ 16,665.60 plus tax |
| 9 | 331 | C06 AA U<br>SHIM | 0.83 | 274.72 | $1.00 each | $ 331.00 plus tax |
| 10 | 1,344 | P12X78 TB<br>T BOLT | 0.07 | 94.08 | INCL. | INCL. |
| 11 | 1,344 | P12 WZ NUT<br>WHIZ NUT | 0.05 | 67.20 | INCL. | INCL. |
| | | **Group Totals** | | **283,332.12** | | **$204,345.79 plus tax** |
| 12 | 3432 | 4246AMDMM-3NA38E-G<br>Wiredeck<br>2.5 x 4.5 Grid<br>3,000# capacity each | | 86,933 | $9.35 each | $ 32,089.20 plus tax |

## SUMMARY

**UNARCO Carton Flow / Pallet Rack System: $204,345.79 plus tax**

**ITC Powder Coated Wire Deck: $  32,089.20 plus tax**

**Freight to Indianapolis, IN. - Rack System: $   3,350.00 plus tax**
**Freight to Indianapolis, IN. - Wire Deck: $   2,800.00 plus tax**

**Installation: $  20,800.00 plus tax**

*Royal Doulton/Schenker Agreement*

Please Note:

Upright Frame has a 3 x 2 13 gage closed tube (Superpost) column and has a capacity of 17,780# at a 66" beam spacing.

Step Beam, 144 x 5 ½, has a capacity of 5,122# per pair.

Step Beam, 144 x 4 3/16, (for Rhinotrac) has a capacity of 2,595# per pair.

Rhinotrac is 15" wide x 2.5" deep x 90" long (for 96" deep structure) with rollers on 3" centers. Capacity is 54.1# per liniar ft.

This quotation is an estimate. The quantities and specs may change when the project is engineered for manufacturing.

Pricing does not include taxes, plan check fees or permit fees.

Labor and equipment to install the following:

> 945 Anchors
> 331 Upright Frm. 240 x 42
> 2994 Step Beam 144 x 42
> 176 Back-to-back Spacer
> 71 Impact Protector
> 336 Step Beam 144 x 4 3/16
> 2688 Rhino Trac x 91"
> 2688 Pair / Hanger Bkts
> 331 Shim
> 1344 T Bolt
> 1344 Whiz Nut
> 3432 Wire Deck 2.5 x 4.5 Grid; 3,000# Capacity

**TOTAL = $20,800.00 plus tax**

Forklift by IISI

Unloading at no charge if trailer can be backed into building; $250.00 / truck if not

All quotes are assuming:

- Clear work area
- Ambient temperature
- Dumpster by other
- Propane forklifts can be used
- Two anchors per upright
- Straight time weekday work / first shift
- Indiana Industrial Services, Inc. safety standards apply
- Any change order from the above quote shall be at $45.00 per man hour

*Royal Doulton/Schenker Agreement*

**46      SCHEDULE 2**

**Product Volumes and Activity Levels**

| WHOLESALE: | ACTUAL 2001 | AVERAGE PER MONTH/CAPACITY * |
|---|---|---|
| Number of Orders Picked | 97,039 | 8,100 |
| Number of Lines Picked | 251,239 | 21,000 |
| Number of Units Picked | 1,925,000 | 160,400 |
| | | |
| Average Lines per Order | 2.6 | 2.6 |
| Average Units per Order | 19.8 | 19.8 |
| Average Units per Line | 7.7 | 7.7 |
| | | |
| RETAIL: | | |
| Number of Orders Picked | 19,227 | 1,600 |
| Number of Lines Picked | 131,962 | 11,000 |
| Number of Units Picked | 925,000 | 77,100 |
| | | |
| Average Lines per Order | 6.9 | 6.9 |
| Average Units per Order | 48.1 | 48.1 |
| Average Units per Line | 7.0 | 7.0 |
| | | |
| TOTAL: | | |
| Number of Orders Picked | 116,266 | 9,700 |
| Number of Lines Picked | 383,201 | 32,000 |
| Number of Units Picked | 2,850,000 | 237,500 |
| | | |
| Average Lines per Order | 3.3 | 3.3 |
| Average Units per Order | 24.5 | 24.5 |
| Average Units per Line | 7.4 | 7.4 |
| | | |

* Capacity based on 23 Working Days +/- 10%

*Royal Doulton/Schenker Agreement*

| 47 | SCHEDULE 3 |
|----|------------|

**Business KPI's are as follows:**

Royal Doulton

| | |
|---|---|
| Advance Shipping Notice sent 5 days in advance of shipment arrival by email | 100% |
| Packing List Detail sent 24 hours in advance of shipment arrival | 100% |

Schenker

| | |
|---|---|
| Quantity Discrepancy Report submitted within 1 Working Day of receipt (does not include returns) | 100% |
| Shipment Error Report (covering clause 4.6) submitted within 4 hours of receipt (does not include returns) | 100% |
| 40ft Container received within 2 Working Days per Container | 100% |
| 20ft Container received within 1½ Working Days per Container | 100% |
| Air Freight shipments received within 1 Working Day per shipment | 100% |
| Order Accuracy (given that Order is "frozen" and final upon transmission to Schenker) | 99.5% |
| Inventory Accuracy (Schenker HTS inventory reconciled against HTS inventory in/out movement) | 99.5% |
| Order releases received by 1pm staged for outbound by the end of business hours on the following Business Day (for "normal" business) | 100% |
| Order releases received after 1pm staged for outbound by the end of business hours within the following 2 Business Days (for "normal" business) | 100% |

**Scope of Works**

General Stock In Process:

1. Receive stock / Unload container;
2. Sort goods if necessary;
3. Reconcile packing list vs. actual goods received, ensure proper external condition as per instructions and produce Discrepancy and Error Reports, as above. In the case where a shipment is in error or damaged we will either quarantine goods or accept proper goods into non-quarantined inventory based on Royal Doulton requirement;
4. Put away goods.

General Pick Process:

1. Order Received / Released in HTS system, triggered by customer EDI;
2. HTS order transmitted to electronic queue for picking;
3. Picker receives Order and proceeds to scan per pick ensuring proper pieces are selected as per customer Order;
4. Picker brings picked order to Packing Area;
5. Packer prints Packing List;
6. Packer checks Order number vs. System, confirms same order matches packing list;

*Royal Doulton/Schenker Agreement*

7. Packer verifies pieces belonging to order as per packing list (either Scanned or manually confirmed);
8. Packer completes second check of outbound order and packs material as per Royal Doulton customer's packing instructions;
9. Packer stages packed and sealed order with relevant warehouse documents in Out Area and HTS System is updated (in the case of UPS we will also print labels at this time and attach to respective boxes);
10. Packed goods staged appropriately (palletized, or moved to UPS pick up door);
11. Orders to same destination point consolidated and shipped via prescribed carrier.

General Outbound Process:

1. Orders are staged separately by Order Number and segregated;
2. Orders are checked and verified against packing list for complete box count before final paperwork is attached;
3. Loading of Orders by Carrier with Trucker signing off per Order picked up.

Replenishment Process:

Based on Min / Max levels available for pick on the shelf (guided by Royal Doulton's forecast) we will pull SKU's from buffer stock and place on the shelf - handled in our system as a relocation.

Other General:

1. On an ad-hoc basis we will follow up with our carriers for POD based on customer requirements. (Current pricing does not include POD tracking for 100% of the shipments but only rather on an as needed basis);
2. Cycle counts are triggered by discrepancies between our system inventory and amount of units sitting on shelf. Once a cycle count has been triggered we will complete this SKU inventory within 24 business hours, as long as it does not interfere with our outbound order processing.

*Royal Doulton/Schenker Agreement*

48    SCHEDULE 4

## Implementation Project Plan

| ID | ❶ | Task Name | Duration | Start | Finish | Predecessors | Resource Names |
|---|---|---|---|---|---|---|---|
| 1 | | Contract / Admin | 120 days? | Fri 08/03/02 | Mon 19/08/02 | | |
| 2 | 📅 | Contract review SI | 11 days? | Fri 08/03/02 | Fri 22/03/02 | | A Dancescu |
| 3 | 📅 | Contract review RD | 11 days? | Mon 25/03/02 | Mon 08/04/02 | 2 | I Hammond |
| 4 | | Contract modification | 4 days? | Tue 09/04/02 | Fri 12/04/02 | 3 | RD / SI |
| 5 | 📅 | Final ratification | 4 days? | Mon 15/04/02 | Thu 18/04/02 | 4 | RD / SI |
| 6 | | Sign contract | 1 day? | Fri 19/04/02 | Fri 19/04/02 | 5 | |
| 7 | 📅 | Terminate leases / Exit Current Contracts (e.g. Equipment and Ser | 60 days | Thu 30/05/02 | Mon 19/08/02 | 6 | B Petrone |
| 8 | | Warehouse / Building Arrangements | 74 days? | Fri 08/03/02 | Mon 17/06/02 | | |
| 9 | | Site selection | 26 days? | Fri 08/03/02 | Fri 12/04/02 | | Pohl / Walker |
| 10 | 📅 | Sign lease | 1 day? | Mon 06/05/02 | Mon 06/05/02 | 5,16,15,17 | Ohlrich |
| 11 | 📅 | Occupy building | 1 day? | Mon 17/06/02 | Mon 17/06/02 | 10 | Walker |
| 12 | | Engineering | 67 days? | Fri 01/02/02 | Fri 03/05/02 | | |
| 13 | ✓ | Prepare building layout concept | 35 days | Fri 01/02/02 | Thu 21/03/02 | | |
| 14 | ✓ | Assess equipment needs | 35 days? | Fri 01/02/02 | Thu 21/03/02 | | |
| 15 | 📅 | Prepare actual building layout | 5 days | Mon 22/04/02 | Fri 26/04/02 | 9 | J. Penek |
| 16 | 📅 | Determine site improvements/requirements | 5 days | Mon 22/04/02 | Fri 26/04/02 | 9 | Team SI |
| 17 | 📅 | Negotiate building improvements | 5 days | Mon 29/04/02 | Fri 03/05/02 | 16 | Pohl / Walker |
| 18 | | Equipment | 146 days? | Fri 01/02/02 | Tue 20/08/02 | | |
| 19 | ✓ | Obtain quotes for Ind racking | 35 days? | Fri 01/02/02 | Thu 21/03/02 | | F Woeste |
| 20 | 📅 | RD Evaluation of current rack value | 20 days? | Mon 25/03/02 | Fri 19/04/02 | | B Petrone |
| 21 | 📅 | Prepare list of packing materials | 20 days? | Mon 25/03/02 | Fri 19/04/02 | | B Petrone |
| 22 | 📅 | Negotiate Rack rates New + RD Current | 5 days | Mon 29/04/02 | Fri 03/05/02 | 21 | FW / AD |
| 23 | 📅 | Issue purchase orders | 5 days | Mon 06/05/02 | Fri 10/05/02 | 22,6 | Ohlrich |
| 24 | | Rack delivery | 40 days | Mon 13/05/02 | Thu 04/07/02 | 23 | Woeste |
| 25 | | Rack Installation | 10 days | Fri 05/07/02 | Thu 18/07/02 | 24 | Woeste |
| 26 | | Shelving Installation | 3 days | Fri 05/07/02 | Tue 09/07/02 | 24 | Woeste |

*Royal Doulton/Schenker Agreement*

*Royal Doulton/Schenker Agreement*

| ID | ❶ | Task Name | Duration | Start | Finish | Predecessors | Resource Names |
|---|---|---|---|---|---|---|---|
| 27 | | Label locations | 5 days | Fri 19/07/02 | Thu 25/07/02 | 25,15 | Woeste |
| 28 | ☑ ◆ | Dissemble conveyors | 3 days? | Sat 10/08/02 | Tue 13/08/02 | | RD |
| 29 | ☑ | Dissemble Packing Stations | 3 days? | Sat 10/08/02 | Tue 13/08/02 | | RD |
| 30 | ☑ | Dissemble Packing Peanut Dispenser | 3 days? | Sat 10/08/02 | Tue 13/08/02 | | RD |
| 31 | | Dissemble remaining Capital Assets and transport | 5 days? | Sat 10/08/02 | Thu 15/08/02 | | RD |
| 32 | ☑ | Install conveyors for packing station | 2 days | Fri 16/08/02 | Mon 19/08/02 | 25,28,31 | Woeste |
| 33 | ☑ | Install packing station | 2 days | Fri 16/08/02 | Mon 19/08/02 | 29,31 | Woeste |
| 34 | ☑ | Install packing peanut dispenser | 2 days | Fri 16/08/02 | Mon 19/08/02 | 25,31 | Woeste |
| 35 | | Install battery chargers | 2 days | Fri 16/08/02 | Mon 19/08/02 | 25,31 | Woeste |
| 36 | ☑ | Receive forklifts | 1 day | Tue 20/08/02 | Tue 20/08/02 | 35 | Woeste |
| 37 | ☑ | Quote Packing materials (current vs. new indy rates) | 10 days? | Mon 22/04/02 | Thu 02/05/02 | 21 | T Walker |
| 38 | | Personnel | 82 days? | Mon 29/04/02 | Fri 16/08/02 | | |
| 39 | ☑ | Advertise/ recruit | 15 days | Mon 29/04/02 | Fri 17/05/02 | 6 | J Kennison/ SI HR |
| 40 | ☑ | Interview candidates | 25 days | Mon 20/05/02 | Thu 27/05/02 | 39 | JK / TW / AP - SI HR |
| 41 | ☑ | Select candidates | 4 days | Mon 24/06/02 | Thu 27/06/02 | 40 | JK / TW / AP - SI HR |
| 42 | | Hire personnel | 1 day | Fri 28/06/02 | Fri 28/06/02 | 41 | AP / SI HR |
| 43 | ☑ | RD - Term Notification for Existing Employees | 46 days? | Mon 17/06/02 | Fri 16/08/02 | | M Shaw |
| 44 | | Implementation | 93 days? | Mon 15/04/02 | Fri 16/08/02 | | |
| 45 | ☑ | Obtain document flow | 5 days | Mon 15/04/02 | Fri 19/04/02 | | FW / JP |
| 46 | ☑ | Record current material flow | 5 days | Mon 15/04/02 | Fri 19/04/02 | | FW / JP |
| 47 | ☑ | Ways of Working / Scope Document | 10 days? | Mon 22/04/02 | Thu 02/05/02 | 46 | AD |
| 48 | ☑ | SOP | 30 days | Fri 03/05/02 | Wed 12/06/02 | 47 | AD / FW / JK |
| 49 | ☑ | Review and Redirect Shipping Paterns to Indy (all Product) | 1 day? | Fri 17/05/02 | Fri 17/05/02 | | G Cornish |
| 50 | ☑ | Determine Obsolete Stock / Stock to be disposed | 9 days? | Wed 01/05/02 | Mon 13/05/02 | | G Cornish |
| 51 | ☑ | Dispose of obsolete stock | 34 days? | Wed 15/05/02 | Fri 28/06/02 | | G Cornish |
| 52 | ☑ | Devise stock (order of shipment) relocation plan | 10 days | Mon 17/06/02 | Fri 28/06/02 | 6 | G Cornish |
| 53 | ☑ | Devise stock in Plan | 10 days? | Mon 01/07/02 | Fri 12/07/02 | 52 | F Woeste |
| 54 | ☑ | Consolidate Stock by SKU | 20 days? | Mon 01/07/02 | Fri 26/07/02 | 52 | B Petrone |
| 55 | ☑ | Transfer of existing stock | 16 days? | Mon 29/07/02 | Fri 16/08/02 | 53,52,22,27 | RD / SI |
| 56 | ☑ | Receipt of containers from overseas | 11 days? | Thu 01/08/02 | Wed 14/08/02 | 27 | |
| 57 | | Disaster recovery plan | 20 days | Tue 18/06/02 | Mon 15/07/02 | 11 | |
| 58 | | Training/Operational/ HTS | 47 days? | Thu 13/06/02 | Thu 15/08/02 | | |

*Royal Doulton/Schenker Agreement*

| ID | ⓘ | Task Name | Duration | Start | Finish | Predecessors | Resource Names |
|---|---|---|---|---|---|---|---|
| 59 | | Develop training manual for operations | 20 days | Thu 13/06/02 | Wed 10/07/02 | 6,48 | |
| 60 | ▦ | Develop HTS training manual | 20 days? | Thu 13/06/02 | Wed 10/07/02 | 48 | |
| 61 | ▦ | Train employees on RD account procedures | 24 days? | Mon 15/07/02 | Wed 14/08/02 | 42 | |
| 62 | ▦ | Train employees on HTS | 24 days? | Tue 16/07/02 | Thu 15/08/02 | 60,76 | |
| 63 | | IT systems | 123 days? | Tue 19/03/02 | Mon 02/09/02 | | |
| 64 | | HTS implementation | 123 days? | Tue 19/03/02 | Mon 02/09/02 | | |
| 65 | ✓ | Installation of HTS in U.S. | 3 days | Mon 01/04/02 | Wed 03/04/02 | | |
| 66 | ▦ | EDI mapping | 64 days? | Tue 19/03/02 | Wed 12/06/02 | | |
| 67 | ▦ | Receive master data from RD | 23 days | Mon 15/04/02 | Tue 14/05/02 | | |
| 68 | | Load master data from RD | 2 days? | Wed 15/05/02 | Thu 16/05/02 | 67 | |
| 69 | 🖻 | Prepare warehouse setup | 5 days? | Mon 13/05/02 | Fri 17/05/02 | 23 | |
| 70 | ▦ | Load warehouse setup files | 2 days | Mon 20/05/02 | Tue 21/05/02 | 69 | |
| 71 | ▦ | Setup customer rules | 23 days | Fri 03/05/02 | Mon 03/06/02 | 47 | |
| 72 | ▦ | Test customer rules | 20 days | Tue 04/06/02 | Mon 01/07/02 | 71 | |
| 73 | | Test EDI transmissions | 30 days | Thu 13/06/02 | Wed 24/07/02 | 66 | |
| 74 | ▦ | Install wiring for RF | 2 days | Tue 18/06/02 | Wed 19/06/02 | 11 | |
| 75 | ▦ | Install network in new facility | 30 days | Tue 18/06/02 | Mon 29/07/02 | 11 | |
| 76 | ▦ | Install hardware for HTS (RF antennas,printers) | 2 days | Tue 18/06/02 | Wed 19/06/02 | 11 | |
| 77 | | Test HTS hardware interaction | 20 days | Thu 20/06/02 | Wed 17/07/02 | 76 | |
| 78 | | Install UPS computer and printers | 2 days | Tue 20/08/02 | Wed 21/08/02 | 32 | |
| 79 | ▦ | Go Live | 3 days? | Thu 15/08/02 | Mon 19/08/02 | | |
| 80 | | On site support | 10 days | Tue 22/08/02 | Mon 02/09/02 | 79 | |
| 81 | ◆ | Transportation Assesment | 39 days? | Thu 28/03/02 | Mon 20/05/02 | | |
| 82 | ▦ | Current Customer Routing Requirements | 22 days? | Fri 05/04/02 | Fri 03/05/02 | | RD |
| 83 | ▦ | Generate Comparison Between Current Carriers based on NJ | 11 days? | Mon 06/05/02 | Mon 20/05/02 | 82 | B Petrone |
| 84 | | RD Retail Trucking quote gathering | 11 days? | Thu 28/03/02 | Thu 11/04/02 | | B Petrone |
| 85 | ▦ | SI Retail Trucking quote gathering | 10 days? | Mon 08/04/02 | Fri 19/04/02 | | T Walker |
| 86 | ▦ | RD to sign contract with carrier | 1 day? | Mon 06/05/02 | Mon 06/05/02 | 85,84 | RD |
| 87 | | RD Customer Announcements | 29 days? | Fri 26/04/02 | Mon 03/06/02 | | |
| 88 | 🖻 | Customer Show - NY | 2 days | Fri 26/04/02 | Sun 28/04/02 | | RD / SI |
| 89 | ▦ | General Customer Letter of Announcement | 1 day? | Mon 03/06/02 | Mon 03/06/02 | | G Cornish |
| 90 | ▦ | Customer Stock Requirement Letters (Pull forward) | 1 day? | Mon 03/06/02 | Mon 03/06/02 | | G Cornish |

| 49 | SCHEDULE 5 |
|---|---|

**Bailee Agreement**

_____, 2002

HSBC Investment Bank plc, as
    Agent and Trustee
City Place House
55 Basinghall Street
London EC2V 5DU
    \
Ladies and Gentlemen:

The undersigned hereby notifies you that:

1.    The undersigned has been informed by Royal Doulton USA Inc. (the "*Credit Party*") of, and hereby acknowledges, the lien and security interest of HSBC Investment Bank plc, as agent and trustee (in such capacities, the "*Security Agent*") under that certain Amended and Restated Security Agreement, dated as of April 10, 2002 (the "*Security Agreement*"), in all of the present and future goods, inventory, merchandise and other property of the Credit Party, and the proceeds thereof (collectively, the "*Property*") stored and/or located at our warehouse and distribution center located at Building 48, Park 100 Business Park, 501 W. 81st Street, Indianapolis, Indiana 46268 (the "*Distribution Center*"), or otherwise held by, or in the custody, possession or control of, the undersigned from time to time.    The undersigned has also been informed by the Credit Party, and hereby acknowledges, that the lien and security interest was granted to the Security Agent by the Credit Party to secure the payment and performance by the Credit Party of any and all present and future obligations and liabilities of the Credit Party to the Security Agent and the other Secured Parties identified in the Security Agreement, including those obligations and liabilities now or hereafter arising under the Guarantee, dated April 10, 2002, made by the Credit Party in favor of the Security Agent.

2.    The undersigned further acknowledges (i) that, by the terms of the Security Agreement, the consent of the Security Agent is required as a precondition to the Credit Party entering into the proposed Warehousing and Distribution Service Agreement (the "*Warehousing Agreement*") with the undersigned, (ii) that such consent of the Security Agent is in turn conditioned, by the terms of the Security Agreement, on the execution and delivery by the undersigned by this letter agreement, and (iii) that the Security Agent is relying upon the agreements of the undersigned contained herein in granting its consent to the Warehousing Agreement.

3.    The Credit Party has made the following arrangements with the undersigned, and the undersigned hereby agrees that:

A.    Upon receipt of the written certification and request of the Security Agent in the form of Exhibit A annexed hereto (the "*Certification and Request*"), (i) the undersigned will not release any of the Property stored and/or located at the Distribution Center or otherwise held by, or in the custody, possession or control of, the undersigned, (ii)

*Royal Doulton/Schenker Agreement*

the undersigned will hold such Property until written notice is received from the Security Agent or any of its agents instructing the undersigned as to the disposition or sale of any of the Property, and (iii) the undersigned will promptly notify the Security Agent in writing of any requests received by the undersigned for the release of any of the Property.

**B.**    At any reasonable time and from time to time, the undersigned will permit the Security Agent and its officers, employees and/or agents, upon reasonable prior notice, to visit the Distribution Center and any other premises where any of the Property is stored or located, or otherwise held by, or in the custody, possession or control of, the undersigned, for the purpose of (i) inspecting the Property, (ii) verifying the amount, quantity, value and condition, delivery and shipment, of the Property, or any other matter relating to, any of the Property, and, in this connection, (iii) reviewing and making extracts from all books, records and files of the undersigned relating to any of the Property. The undersigned further agrees to confirm to the Security Agent balances of the Property when an inventory is taken by the undersigned, and to make available to the Security Agent, upon the its request, copies of any such inventory.

**C.**    Upon receipt of the Certification and Request, and without presentation or surrender of any warehouse receipt issued by the Distribution Center to the Credit Party, the undersigned will permit the Security Agent (i) to perform the inspection and procedures referred to in paragraph 3(B) above without the participation of the Credit Party, (ii) to enter the Distribution Center and any other premises where any of the Property is stored or located, or otherwise held by, or in the custody, or possession or control of, the undersigned and, subject to paragraph 3(D) below, peaceably to take physical possession of any or all of such Property or move the same or any part thereof to such other place or places as the Security Agent shall, in its sole and absolute discretion, choose, or to impose a field warehousing arrangement specified by the Security Agent, and (iii) in addition to the rights of the Security Agent described above, and without notice, demand or other process, to discuss any matters related to the Credit Party or the Property with any of the officers, managers or employees of the undersigned.

**D.**    The undersigned expressly agrees that its rights in any of the Property and any and all liens that the undersigned may have in any of the Property, including, without limitation, any possessory or other lien, whether arising by operation of law or statute, or by agreement with the Borrower, shall be subordinated and inferior to the Security Agent's interest in the Property, and that the undersigned will not exercise or enforce any warehouseman's or bailee's lien that the undersigned might have with respect to any of the Property, (i) so long as the Security Agent shall have an interest in the Property, and (ii) provided that all service fees due and owing by the Credit Party, or accrued, under the Warehousing Agreement through the date of the undersigned's receipt of the Certification and Request shall have been paid or otherwise satisfied in full by or on behalf of the Credit Party. Subject to the conditions set forth in the immediately preceding sentence of this paragraph 3(D), the undersigned will not hinder or delay the Security Agent in enforcing its rights in and to the Property.

**E.**    The undersigned will utilize only non-negotiable warehouse receipts in connection with any of the Property held by the undersigned for the account of the Credit Party.

**F.**    All charges and fees of the undersigned of any nature whatsoever relating to the Property shall continue to be, and shall be, payable solely by the Credit Party,

37

*Royal Doulton/Schenker Agreement*

provided that the Security Agent shall be responsible for the customary charges and fees of the undersigned from and after the date of the undersigned's receipt of the Certification and Request. The Security Agent agrees to pay all such charges within fifteen (15) days after its receipt of the undersigned's invoice therefor. Amounts not paid when due shall bear interest at the rate of 18% per annum or the highest rate permitted by law, whichever is less, until paid. The undersigned may terminate this letter agreement and shall have no further obligation hereunder if the Security Agent fails to make any payment hereunder when due and such failure shall continue for fifteen (15) days after the due date; and the undersigned shall have a lien on the Property to the extent necessary to secure payment of amounts due from the Security Agent. The Security Agent shall not be liable or responsible, directly or indirectly, for any services fees or other charges of the undersigned accruing prior to the undersigned's receipt of Certification and Request, whether due or to become due.

G.      The undersigned will not terminate or cancel the Agreement without giving the Security Agent the same notices which must be given to the Credit Party under the Warehousing Agreement (including notices of breach and notices of termination) and affording the Security Agent an additional ten (10) business days, after the expiration of any cure period available to the Credit Party under the Warehousing Agreement, within which to cure any breach of said Agreement by the Credit Party; provided, however, that the Security Agent shall be under no obligation to cure any such breach by the Credit Party.

H.      In the event that the undersigned now or in the future deals in goods of the same type as the Property, the undersigned (i) will segregate the Property from any similar goods owned by the undersigned, (ii) will clearly identify the Property as belonging to the Credit Party, and (iii) will notify all present and future creditors of the undersigned holding liens on the goods of the undersigned to (x) that the undersigned is holding, and may from time to time hold, goods belonging to the Credit Party and that such goods are warehoused by the undersigned, (y) that any lien that such creditors have or may have on any of the property of the undersigned does not and will not attach to the Property, and (z) requesting that such creditors not hinder or delay the Credit Party or the Security Agent from obtaining possession of the Property. The undersigned agrees to take, at the expense of the Security Agent, such further actions as the Security Agent may reasonably request to protect any of the interests of the Credit Party or the Security Agent in the Property, including, without limitation, the execution of UCC-1 financing statements.

I.      The undersigned will designate the Property as the property of the Credit Party and will segregate and store the Property in the Distribution Center in accordance with the terms of the Warehousing Agreement. In no event shall the undersigned have any liability to the Security Agent or Credit Party for any loss of or damage to the Property beyond the liability provided for in the Warehousing Agreement or for any disposition of the Property done in substantial compliance with the Warehousing Agreement; provided, however, that after receipt of a Certification and Request, the undersigned shall act on the instructions of the Security Agent and in accordance with the terms of this letter agreement.

The arrangements and instructions outlined herein shall continue without any change or modification, unless and until the Security Agent shall have provided written notification to the undersigned to the contrary and, if any such changes or modifications adversely affect, or increase the expenses or liabilities of, the undersigned, the undersigned shall have agreed to such modifications in writing. The undersigned has executed this letter agreement as of the date first set forth above.

*Royal Doulton/Schenker Agreement*

SCHENKER INC.

By: _____

    Name:

    Title:

The Credit Party hereby confirms that this is a "*Security Document*" for the purposes of the Credit Agreement (as defined in the Security Agreement).

CONFIRMED and AGREED TO:           CONFIRMED and AGREED TO:

ROYAL DOULTON USA, INC.           HSBC INVESTMENT BANK plc,
                                     as Security Agent

By: _____    By: _____

    R. Bruce McKerrall            Name:

    Vice President               Title:

    Finance & Administration

*Royal Doulton/Schenker Agreement*

**EXHIBIT A**

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

[Date]

Schenker Inc.
150 Albany Avenue
Freeport, New York 11520

Ladies and Gentlemen:

Attached hereto is a copy of your letter to the undersigned dated ____ __, 2002.

The undersigned, HSBC Investment Bank plc, as Security Agent, hereby informs you that an Event of Default, as defined in the Amended and Restated Security Agreement described in your letter to the undersigned, has occurred and is continuing, and, therefore, hereby instructs you:

1.    Not to release any of the Property of Royal Doulton USA Inc. stored or located at your Distribution Center in Indianapolis, Indiana, or otherwise held by you or in your custody, possession or control, and to hold all such Property until further notice is received from the undersigned or its agents, instructing you to release such Property; and

2.    To promptly notify the undersigned of any requests that you receive from any person for the release of the Property.

Very truly yours,

HSBC INVESTMENT BANK plc,
  as Security Agent

By: _____
      Name:
      Title:

Enclosure